THOMAS A. CURTIS, M.D., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Curtis v. Commissioner
Docket No. 8310-91
United States Tax Court
T.C. Memo 1994-15; 1994 Tax Ct. Memo LEXIS 13; 67 T.C.M. (CCH) 1958; January 11, 1994, Filed *13 Decision will be entered under Rule 155. For petitioner Bernard Oster.
For respondent Donna F. Herbert. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income tax: Additions to Tax
Sec.
Sec. Sec. Sec.
FYE Deficiency
6653(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
6661
4/30/88
$ 165,257
--
$ 8,263
[1]
$ 41,314
4/30/89
190,640
$ 9,532
--
--
47,660
After concessions, [1] the remaining issues for decision are: (1) Whether the amounts paid by petitioner to Ellen Curtis as compensation during fiscal year ended (FYE) April 30, 1988, and FYE April 30, 1989, are reasonable within the meaning of section 162(a)(1); [2] (2) if the amounts paid by petitioner to Ellen Curtis did not constitute reasonable allowances for compensation under section 162(a)(1), what amounts are reasonable; (3) whether petitioner is liable for additions to tax under section 6653(a)(1) for negligence for the years in issue; and (4) whether petitioner is liable for additions to tax under *14 section 6661(a) for substantial understatement of tax liability for the years in issue. *15 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference. Thomas A. Curtis, M.D., Inc. (hereinafter corporation or petitioner) is a professional/medical corporation duly formed and organized under the laws of the State of California. At the time the petition was filed, its principal place of business was in North Hollywood, California. The articles of incorporation were filed with the secretary of state on or about July 25, 1973. The corporation conducts a medical psychiatric practice that specializes in the psychiatric evaluation and care of patients involved in worker's compensation cases. During the taxable years in issue, the corporation operated and maintained three offices located in Los Angeles and Orange Counties. A fourth office was established in Covina during FYE April 30, 1989. Dr. Thomas A. Curtis graduated from the University of Manitoba in Winnipeg, Canada, with an M.D. honors degree in 1967. At that time, he immigrated to the United States and completed his internship, training in psychiatry, and the residency training program at the Los Angeles County *16 University of Southern California Medical Center in 1972. In 1974, he became board certified. Dr. Curtis formed the corporation in 1973 as a personal service corporation. Prior to 1983, the practice focused on general psychiatry, primarily working in the family law area. In 1982, he began to evaluate and treat worker's compensation patients for Superior Care, where he met Ellen Curtis. Ellen Barnert Curtis (hereinafter Ms. Curtis), [3] a registered nurse, joined the corporation's practice in 1983. She received her nurse's training at the Sinai Hospital School of Nursing. She finished her bachelor's degree in science at Redlands. Ms. Curtis subsequently took courses in worker's compensation at the University of Southern California Law School. She has worked as a nurse since she was 22 years old. In addition to working in medical surgical nursing, she designed, coordinated, developed, and eventually managed an ambulatory hospital system, establishing policies and procedures and making hiring decisions. *17 Prior to joining the corporation, Ms. Curtis' experiences were extensive in the area of psychiatric treatment and worker's compensation. Over a period of 3 years, Ms. Curtis implemented a new psychiatric program at Valley Hospital which included designing the unit, hiring personnel, teaching seminars, staffing, and group therapy. After working for 2 years at Van Nuys Psychiatric Hospital, Ms. Curtis joined Superior Care, where she met and first worked with Dr. Curtis. Superior Care is a medical treatment center that provides orthopedic, neurological, and internal medicine services for injured workers. Upon meeting Dr. Curtis, Ms. Curtis was asked to help him set up a treatment program. They had to design the program and prove its viability to the executives at Superior Care. Ms. Curtis worked with the marketing staff and taught them about psychiatry, stress on the job, depression and anxiety suffered by people with physical injuries, and how to elicit referrals. Upon the program's implementation, Ms. Curtis compiled monthly statistics for the comptroller including the number of patients in treatment and the amount of evaluation given. From this experience at Superior Care, *18 Ms. Curtis developed the idea of building a similar practice with Dr. Curtis. In 1983, Ms. Curtis explained the future goals for a worker's compensation psychiatric practice to Dr. Curtis. At that point, Dr. Curtis invited her to join the practice as vice president and owner of one-third of the outstanding stock. Dr. Curtis was the president of the corporation and a member of its board of directors, owning the remaining two-thirds of the outstanding stock. Although their individual ownership interests in the corporation were not equal, both Ms. Curtis and Dr. Curtis viewed the business as an equal partnership. Ms. Curtis' efforts have been a primary reason for the corporation's success. In the beginning, Ms. Curtis went to the banks and arranged the necessary financing for operations. She set up a computerized system to help generate reports, interviewed the psychologists who participated in the preparation of the reports, compiled business projections, interviewed and hired accountants, and set up the referrals. As a consequence, Ms. Curtis is exclusively responsible for maintaining and acquiring new sources of referrals -- mainly, attorneys working in the area of worker's *19 compensation. Ms. Curtis made the decision to lower the corporation's operating expenses by utilizing leased employees and independent contractors (psychologists). The total staff, including contracted psychologists, numbers between 60 and 80 people. Ms. Curtis works between 60 and 70 hours per week personally supervising all the departments set up within the corporation and the independent contractors, including scheduling and staffing of all the corporation's offices. Because the law in worker's compensation is constantly changing, Ms. Curtis exclusively monitors the administrative, appellate ruling, and legislative changes, subsequently modifying office procedures to accommodate them. She regularly attends semi-annual meetings given by California attorneys that update and teach technical aspects of the law. Consequently, she is very familiar with worker's compensation law as well as the rules and procedures. Ms. Curtis effectively assisted in collection of fees for the corporation by attending settlement conferences and developing a rapport with judges, defense attorneys, and adversaries. In the area of worker's compensation, the report generated by the doctor serves in *20 the place of in-court testimony. The report must meet certain established standards in order to be admitted into evidence. Consequently, if these evaluation reports contain the requisite quality, they are sought after by attorneys attempting to win money for their injured clients. Because the quality of the reports generated by the corporation is its primary foundation for success, Ms. Curtis has expended an extensive amount of time in creating and refining an efficient system. She has set up a detailed scheduling process as well as procedural manuals for each of the various elements within the practice that contribute to generating the reports -- the doctors, word processing, editing, historians, etc. In addition, she has worked with computer specialists in setting up a mail merge program to facilitate generating the reports. This program makes it possible for the offices to generate its current volume of medical reports. The corporation presently generates the following approximate number of reports per month: Type of Report
Total Initial comprehensive psychiatric
evaluation reports  90
Reevaluation reports
75
Progress reports on patients in treatment
200 to 300
Supplemental reports
30 to 40
Medical record review reports (approx. 3 pages)
30 to 40
*21 Ms. Curtis consults with specialists in various areas of the corporation's business (e.g., accounting, personnel management, computers, word processing, etc.) on a regular basis to ensure the corporation is always functioning as efficiently as possible and performing at its optimum level. As of the date of trial, the corporation had six functioning offices. The initial setup of these offices (including selecting a site, marketing and promotion to attorneys and referral sources, and acquiring the necessary financing) was all conducted by Ms. Curtis. In addition, she set up all the psychologists that participate in the reports, scheduling which doctor worked in a particular office at a set time. During the years in issue, the corporation had no officially recorded or written compensation policy. Upon joining the corporation, Ms. Curtis did not have an employment contract setting the rate of pay or containing any noncompete provisions. Although their salaries were not initially equal, [4] after several years of working together Ms. Curtis and Dr. Curtis began receiving equal salaries from the corporation. For the years in issue, their annual compensation was set according to the *22 corporation's projected billables. With a fiscal yearend of April 30, they took the total billings for May, the first month of billing, which was almost always the lowest, multiplied it by 12 months, and took 10 percent of the total for each of them. The corporation reported the following financial figures for the years in issue: FYE 4/30/88
FYE 4/30/89
Total Income (Cash Method)
$ 2,895,286
$ 3,257,485
Taxable Income
13,514
3,961
Total Tax
0
411
Accounts Receivable Balance
5,049,329
5,731,987
Amounts Billed
4,046,990
4,359,328
The amount of the accounts receivable evidences the growth of the corporation's practice. However, because of long collections periods, financing is needed to meet the everyday cash needs of the business -- payroll, rent, utilities, *23 etc. Therefore, long-term financing arrangements have been necessary to sustain the corporation's growth. Ms. Curtis is the sole person who initiated and maintained the corporation's necessary banking relationships. During the years in issue, the corporation had only two employees, Dr. Curtis and Ms. Curtis. For FYE April 30, 1988, the corporation paid them each $ 431,500 in compensation. For FYE April 30, 1989, they each received $ 510,500 in compensation. In addition to a salary, the corporation provided Ms. Curtis a 1986 Mercedes Benz, medical insurance, life insurance, a pension plan (the corporation contributed approximately $ 50,000 a year), and rent on a personally owned condominium used for business purposes. No dividends were paid during either year in issue. [5]
On February 6, 1991, respondent issued a notice of deficiency to petitioner for FYE April 30, *24 1988, and FYE April 30, 1989. In the notice to petitioner, respondent determined that the compensation amounts claimed for FYE April 30, 1988, and FYE April 30, 1989, must be reduced by $ 331,500 and $ 405,500, respectively. [6] Respondent concluded that these amounts exceeded a reasonable allowance for salaries or other compensation for personal services rendered within the meaning of section 162. The challenged amounts pertained solely to compensation paid to Ms. Curtis. Dr. Curtis' salary was not questioned. OPINION Respondent's determination of deficiencies for the years in issue is presumed correct, and petitioner bears the burden of proving respondent erred. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).
*25 Reasonable Compensation
The first issue for our consideration is whether the amounts paid by petitioner to Ms. Curtis as compensation for the years in issue were reasonable within the meaning of section 162(a)(1) and thus deductible. Respondent contends that the maximum amount of compensation paid by the corporation to Ms. Curtis that can be considered reasonable for FYE April 30, 1988, and FYE April 30, 1989, is $ 192,500 and $ 215,670, respectively. To the contrary, petitioner contends that the compensation paid to Ms. Curtis for the years in issue was reasonable and commensurate with the value of the services she performed. Section 162(a)(1) provides that there "shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered". The test of deductibility in the case of compensation payments is twofold: (1) Whether the amount of the payment is reasonable in relation to the services performed (the "amount test"), and (2) whether the payment is in fact made for services rendered *26 (the "intent test"). Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200; sec. 1.162-7(a), Income Tax Regs. The determination of whether the requirements for deductibility are met is factual based on the record of each case. Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Neither party has suggested that the payments to Ms. Curtis were made for anything other than services she actually rendered or performed. Accordingly, we will only address the first element of the deductibility test -- whether the amounts of the payments were reasonable. Reasonable compensation is determined by comparing the amount of compensation paid to an individual with the value of the services performed. This determination is made on an individual employee basis and not in terms of aggregate compensation paid to all employees. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court. All *27 facts must be considered; no one factor is determinative. Estate of Wallace v. Commissioner, supra (citing Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7). In Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282, the Court of Appeals for the Ninth Circuit enumerated five factors to be considered in determining reasonable compensation: (1) The employee's role in the company; (2) external comparison of the employee's salary with those paid by similar companies for similar services; (3) character and condition of the company; (4) conflict of interest in relationship of the employee to the corporation; and (5) the internal consistency in the company's treatment of payments to employees. a. Role in the Company
Relevant considerations concerning an employee's role in the company include the position held by the employee, hours worked, duties performed, and the general importance of the employee to the success of the company. *28 American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972). In addition, a dramatic increase in a substantial shareholder's salary without a corresponding dramatic increase in responsibilities will not be favorably considered. Pacific Grains, Inc. v. Commissioner, supra at 607. However, an employee's superior qualifications and/or contributions to the business may justify a high level of compensation. See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1158 (1980); Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972). In the case at hand, the importance of Ms. Curtis' role in the company cannot be questioned. Notwithstanding the fact that she is vice president and works, on the average, 60 to 70 hours per week, Ms. Curtis' vision for expansion and ability to constantly acquire and subsequently maintain attorney referrals have been of paramount importance to the corporation's success. Although Dr. Curtis' medical training *29 and expertise is the foundation upon which the practice is built, Ms. Curtis' contributions to the final work product -- the medical report -- cannot be undervalued. The quality of the final medical report is the corporation's most effective marketing and sales tool. The quality and usefulness of the medical report have been the very focus of Ms. Curtis' efforts since joining the corporation, as evidenced by the various departments and complex processes she has devised along the way. Therefore, we find that Ms. Curtis' role in the company is a factor in petitioner's favor. b. External Comparison
One of the most important factors in determining reasonableness is the comparison of the compensation in question with compensation paid for similar services by similar companies in the same industry. Elliotts, Inc. v. Commissioner, supra at 1246; sec. 1.162-7(b)(3), Income Tax Regs. For at least one circuit, this factor is considered "the most significant factor". Rutter v. Commissioner, 853 F.2d 1267, 1273 (5th Cir. 1988). For the evidence of comparable salaries to be accorded any weight, it must be shown that *30 such evidence is comparable in terms of work responsibility, nature of operations, years in which paid, and even as to the local cost of living. See, e.g., Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84; Snyder Bros. Co. v. Commissioner, T.C. Memo. 1980-275; Townsend v. Commissioner, T.C. Memo. 1980-264. Industry standards are important in determining whether compensation is reasonable. See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Both parties presented expert testimony as to what level of salary was reasonable for an officer/shareholder in a position comparable to Ms. Curtis'. Petitioner called as its expert David John Thomsen, Ph.D., a specialist in the area of compensation and benefits who works part of the year for a consulting firm and the other part of the year as a researcher/director for the Economic Research Institute. His analysis was based on Ms. Curtis' role in the corporation as reflected in her duties, where the corporation sits within the population *31 of psychiatric offices (performance, size, profitability), equity, and average compensation for offices similar to the one in issue. In his written report to the Court, Thomsen concluded that the "maximum reasonable compensation" for a person in Ms. Curtis' position, using the position of chief executive officer, was $ 588,210 and $ 624,416 for salary and bonus for fiscal years 1988 and 1989, respectively. In making these conclusions, Thomsen assumed that: (1) Ms. Curtis was engaged full time in managing the affairs of the corporation and did not have any other jobs or responsibilities outside of petitioner; (2) Ms. Curtis performed extraordinary duties not commonly found among practices of similar size and organizational design; and (3) the performance results of the corporation were at the 95th percentile for the approximate 16,000 psychiatric offices in existence. Respondent called as her expert witness E. James Brennan III. As president of Brennan, Thomsen Associates, Inc., Brennan conducts pay studies and surveys. In the summary findings, Brennan compared the pay levels of top officers of companies with revenues of $ 2.8 million for fiscal year 1988 and $ 3.2 million for *32 fiscal year 1989 in all industries, service industries, business and professional service industries, and diversified service industries. The following table summarizes his findings: Competitive
Maximum Average Pay
Reasonable Pay
Fiscal Year 1988
All industries
[1] CEO   $ 98,540 $ 187,810
[2] COO   79,650
149,590
Services
CEO  108,690
218,460
COO  97,130
192,500
Business & prof. service
CEO  119,767
-- COO  79,598
-- Diversified service
CEO  123,340
-- COO  86,970
-- Competitive
Maximum Average Pay
Reasonable Pay
Fiscal Year 1989
All industries
CEO  $ 106,680
$ 200,020
COO  90,620
160,710
Services
CEO  117,240
238,550
COO  108,650
215,670
Business & prof. service
CEO  126,753
-- COO  90,055
-- Diversified service
CEO  125,120
-- COO  72,770
-- Brennan's summary findings were supplemented by survey data on each of these industries. Brennan concluded that Ms. Curtis' role in the corporation was that of a chief operating officer (COO) instead of a chief executive officer (CEO). *33 [7] Accordingly, he concluded that the maximum reasonable total compensation for Ms. Curtis should be $ 192,500 for fiscal year 1988 and $ 215,670 for fiscal year 1989. We do not fully accept the conclusions of either party's expert witness. In reaching his conclusions regarding the reasonableness of Ms. Curtis' compensation, Brennan used considerable factual data and his report was well documented. However, he offered very limited data on businesses that provide psychiatric services. Instead, his report was based on the services industry as a whole, the makeup of which is necessarily diverse. We are not satisfied that a reasonable level of compensation for an executive like Ms. Curtis can be *34 accurately determined by reference to the industries Brennan surveyed because of the absence of significant information on businesses similar to petitioner's. Comparing the compensation paid to officers of companies that differ markedly provides guidance of dubious quality. Diverse Industries, Inc. v. Commissioner, supra (citing Niagara Falls Coach Lines, Inc. v. Commissioner, T.C. Memo. 1977-269). Furthermore, evidence of comparable salaries is not as useful in the case of a professional personal service corporation, such as petitioner, for which the best evidence of the value of the services provided is the profit made, as discussed below. See LaMastro v. Commissioner, 72 T.C. 377, 384 (1979) (citing Bianchi v. Commissioner, 66 T.C. 324 (1976)). Nevertheless, we disagree with Brennan's conclusion that Dr. Curtis, as opposed to Ms. Curtis, is the CEO of the corporation. In his own report, Brennan refers to the CEO as the person responsible for long-term strategic planning and accountable for continual profitability to the board of directors. Upon *35 evaluation of the record, we find scant evidence that Dr. Curtis was in any way involved in these processes. Ms. Curtis was the sole person who arranged for long-term financing, located and started new offices, promoted new business, and monitored the corporation's cash-flow and profitability. However, we are no more convinced by the conclusions of petitioner's expert witness, Thomsen. Although his report was significantly more tailored to petitioner's practice and corporate makeup, we found his figures for "maximum reasonable compensation" to be inflated and unsupported by strong factual findings. We are more inclined to accept his findings of "average competitive compensation", which appear to be based on more detailed surveys of physicians' practices. [8]
Therefore, we find that this factor does not weigh favorably for either party. c. *36 Character and Condition of the Company
The focus under this element is on the company's size as indicated by its sales, net income, or capital value, and the complexities of the business and general economic conditions. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1246 (9th Cir. 1983) (citing E. Wagner & Son v. Commissioner, 93 F.2d 816, 819 (9th Cir. 1937)). For fiscal years 1988 and 1989, the corporation had revenues exceeding $ 2.8 million and $ 3.2 million, respectively. Although the net profit of the corporation was not impressive when compared to the revenues for the years in issue, other factors such as a large accounts receivable balance point towards a successful operation. Neither party presented direct evidence with which we can definitively compare petitioner's operations with those of similar businesses. However, the evidence does suggest that petitioner was one of the larger and more successful companies of its kind. The amount of revenues and the number of reports generated make the corporation somewhat unique among other psychiatric practices. d. Conflict of Interest
In Elliotts, Inc. v. Commissioner, supra at 1246, *37 the Court of Appeals listed factors that may indicate a conflict of interest: The primary issue within this category is whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). Such a potentially exploitable relationship may exist where * * * the employee is the taxpaying company's sole or controlling shareholder, or where the existence of a family relationship indicates that the terms of the compensation plan may not have been the result of a free bargain * * * [Fn. ref. and citations omitted.]
In evaluating the reasonableness of compensation paid to a shareholder-employee, the Court of Appeals recommends considering it from a hypothetical independent shareholder's perspective: If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. *38 If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary.
Id. at 1247 (fn. ref. omitted). During FYE April 30, 1988, petitioner reported equity of $ 19,723 and a net loss of $ 11,453 [9] -- a negative return of 58 percent. During FYE April 30, 1989, petitioner reported negative equity of $ 10,366 and a net loss of $ 30,087 -- a negative return of 290 percent. Without even computing an average rate of return for these 2 years, it is clear that such an average would not satisfy an independent investor, thus leading to the conclusion that Ms. Curtis and Dr. Curtis were exploiting their relationship with the corporation. *39 Furthermore, the corporation did not pay dividends to its shareholders for the years in issue which further affirms a practice by petitioner of disguising nondeductible corporate distributions as salary. Although the "automatic dividend rule" [10] is no longer applicable in reasonable compensation cases, the absence of dividends is still a "red flag" that invites further scrutiny on the part of the court. Edwin's, Inc. v. United States, 501 F.2d 675, 677 n.5 (7th Cir. 1974). Therefore, we find that this element weighs in favor of respondent. *40 e. Internal Consistency
The final element is internal consistency in a company's treatment of payments to its employees. Evidence of such inconsistency may indicate that payments go beyond reasonable compensation. Diverse Industries, Inc. v. Commissioner, T.C. Memo. 1986-84 (citing Elliotts, Inc. v. Commissioner, supra at 1247). In determining whether the salary paid a particular employee is reasonable, the salaries paid other employees of the business are relevant. Home Interior & Gifts, Inc. v. Commissioner, 73 T.C. at 1159. The existence of a longstanding, consistently applied compensation plan is evidence that questioned salary payments are reasonable. Elliotts, Inc. v. Commissioner, supra.
Because of the corporation's unique structure of having only two employee-shareholders and the remainder of the staff's being leased through a management company, this factor is not directly applicable or helpful to our determination of reasonableness. An issue raised in this case is the lack of signed corporate minutes for the years in issue approving petitioner's compensation *41 policy. Petitioner explains that its attorney was sick during this time and, therefore, it did not discover the error until after the attorney's death. We do not find this fact to be relevant to our determination of reasonableness. The presence of a formal board resolution as to officers' compensation in closely held corporations is considered uneventful, often carrying little or no weight. See Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 713-714 (1977); Boyle Fuel Co. v. Commissioner, 53 T.C. 162, 169 (1969). Petitioner further argues that respondent has taken an inconsistent position by questioning Ms. Curtis' amount of compensation but not the compensation paid to Dr. Curtis. Petitioner concludes that respondent's position is "antediluvian" and constitutes sexual discrimination. Although we do not fully understand why respondent determined that only Ms. Curtis' compensation was excessive under the facts of this case, we will not look behind respondent's statutory notice absent substantial evidence of unconstitutional conduct. Graham v. Commissioner, 82 T.C. 299, 308-309 (1984), *42 affd. 770 F.2d 381 (3d Cir. 1985). f. Conclusion
We have considered the factors relevant to deciding reasonable compensation for Ms. Curtis. Based on all the evidence, we hold that reasonable compensation for Ms. Curtis for FYE April 30, 1988, was $ 227,000 and for FYE April 30, 1989, was $ 239,000. Additions to Tax -- Negligence
In her notice of deficiency, respondent determined that petitioner is liable for an addition to tax for negligence under section 6653(a) for FYE April 30, 1988, and FYE April 30, 1989. Negligence under section 6653(a) is a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964)). Petitioner bears the burden of proof regarding the additions to tax under section 6653(a). Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Section 6653(a)(1)(A), in effect for FYE *43 April 30, 1988, provides that if any part of the underpayment is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the entire underpayment. Section 6653(a)(1)(B), also in effect for FYE April 30, 1988, imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence or intentional disregard. An "underpayment" for purposes of section 6653 is a "deficiency" as defined in section 6211, i.e., the amount by which the tax liability exceeds the tax shown on the return, except that the tax shown on the return is taken into account only if the return was timely filed. See sec. 6653(c)(1). In the case at hand, petitioner failed to prove it was not negligent in claiming the deductions for compensation paid to Ms. Curtis or that respondent erred in her determination. Accordingly, we find petitioner liable for negligence under section 6653(a)(1)(A) for FYE April 30, 1988, as to the entire remaining underpayment. As to section 6653(a)(1)(B), petitioner is liable for an addition to tax equal to 50 percent of the *44 interest payable with respect to the portion of the underpayment due to negligence. Since we previously found that petitioner overstated Ms. Curtis' compensation by $ 204,500 ($ 431,500 claimed less $ 227,000 found as reasonable) and failed to prove it was not negligent in doing so, the 50 percent addition under section 6653(a)(1)(B) will be applicable to the interest payable under section 6601 with respect to the portion of the underpayment attributable to the excessive deduction of $ 204,500. Section 6653(a)(1), in effect for FYE April 30, 1989, similarly provides that if any part of the underpayment is due to negligence, 5 percent of the entire underpayment shall be added to the tax. However, beginning in 1988, section 6653(a) no longer imposed an addition to tax equal to 50 percent of the interest associated with the portion of the underpayment due to negligence. Again, petitioner failed to meet its burden of proving that respondent erred in her determination or that it was not negligent in deducting the compensation it paid to Ms. Curtis. Accordingly, we find petitioner liable for negligence under section 6653(a)(1) for FYE April 30, 1989, as to the entire remaining *45 deficiency. Additions to Tax -- Substantial Understatement
Respondent determined that petitioner is liable for additions to tax under section 6661 for substantial understatement of income tax liability for FYE April 30, 1988, and FYE April 30, 1989. Section 6661(a) imposed an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. An understatement is substantial if it exceeds the greater of: (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $ 10,000. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2)(A); Tweeddale v. Commissioner, 92 T.C 501, 505 (1989). The amount of the understatement can be reduced if substantial authority exists or existed for petitioner's tax treatment of the item in dispute, or if relevant facts regarding petitioner's treatment of the item were adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Petitioner submits that *46 its treatment of Ms. Curtis' compensation was substantially authorized under prevailing case law, citing the numerous cases used to support its reasonable compensation argument. The standard for substantial authority is less stringent than a "more likely than not" standard (a greater than 50 percent likelihood of being upheld in litigation), but more strict than a "reasonable basis" standard. Sec. 1.6661-3(a)(2), Income Tax Regs. Furthermore, substantial authority is only present if the weight of the authorities supporting the treatment of an item is substantial in relation to the weight of the authorities supporting contrary positions. Sec. 1.6661-3(b), Income Tax Regs.
In the case at hand, a substantial understatement exists for both years in issue. Furthermore, petitioner has failed to meet its burden of proving that substantial authority exists for its deduction of excessive and unreasonable compensation. Additionally, the weight of authorities supporting a position contrary to petitioner's is substantially greater than that of favorable authorities. Accordingly, we find petitioner liable for the addition to tax under section 6661(a) for both years in issue. To reflect *47 the foregoing, Decision will entered under Rule 155. Footnotes
1. 50 percent of interest due on portion of underpayment attributable to negligence.↩
1. On Sept. 14, 1992, the parties filed an agreement with this Court containing mutual concessions as to allowable automobile depreciation, automobile expense, insurance expense, entertainment and promotion expense, and rent expense deductible in FYE Apr. 30, 1988, and FYE Apr. 30, 1989, and any additions to tax associated with these adjustments. On Sept. 16, 1992, a joint motion to sever the pension actuarial issue from this case was granted by this Court. Furthermore, Thomas A. Curtis and Ellen G. Curtis, petitioners in docket No. 7011-91, conceded all adjustments to their individual income tax return for FYE Dec. 31, 1988. Consequently, a decision was entered on Nov. 25, 1992, with a tax deficiency of $ 1,368 for tax year 1988.↩
2. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Ellen Barnert became Ellen Barnert Curtis after her marriage to Dr. Thomas Curtis in 1984.↩
4. Petitioner reported the following amounts as compensation for the fiscal periods prior to the years in issue: ↩
Dr. Curtis
Ellen Curtis
FYE 4/30/85
$ 55,231 $ 32,400 FYE 4/30/86
95,000
95,000
FYE 4/30/87
250,000
250,000
5. In addition, the corporation reported no dividends on its Form 1120 Federal income tax returns for FYE Apr. 30, 1985, through FYE Apr. 30, 1987.↩
6. At trial, respondent's expert witness testified that the maximum reasonable compensation for Ms. Curtis should be $ 192,500 for FYE Apr. 30, 1988, and $ 215,670 for FYE Apr. 30, 1989. Therefore, it appears that respondent has modified her original position as stated in the statutory notice of deficiency.↩
1. "CEO" denotes the position of chief executive officer.↩
2. "COO" denotes the position of chief operating officer.↩
7. Brennan describes a chief operating officer (COO) as a person responsible for directing, administering, and coordinating the activities of the corporation. The COO frequently carries the title of president and reports directly to the chief executive officer (CEO), who usually carries the title of chairman of the board.↩
8. In his summary of findings, Thomsen listed the "average competitive total direct compensation" to be $ 226,959 and $ 226,324 for fiscal years 1988 and 1989, respectively.↩
9. To arrive at petitioner's equity, we added together the listed amount for paid-in or capital surplus, capital stock, and unappropriated retained earnings from Schedule L (Balance Sheet) on Form 1120. To arrive at its net profits, we took the net income or loss amount per books (Line 1) from Schedule M-1 (Reconciliation of Income per Books With Income per Return) on Form 1120.↩
10. The Internal Revenue Service and courts have rejected the "automatic dividend rule" -- that lack of payment of any dividends by a corporation must result in a determination of some disguised dividend -- in interpreting the provisions of sec. 1.162-7(b)(1), Income Tax Regs. See Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983); Rev. Rul. 79-8, 1979-1 C.B. 92↩.