T.C. Memo. 2001-81

UNITED STATES TAX COURT

PEDIATRIC SURGICAL ASSOCIATES, P.C., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12743-98.                        Filed April 2, 2001.

        P is a personal service corporation in the
business of providing pediatric surgical services.  It
employs both shareholder surgeons and nonshareholder
surgeons to perform such services.  For the years in
issue, the shareholder surgeons received a fixed
monthly salary plus monthly bonuses consisting of
available cash less amounts needed to pay P's near-term
expenses.  The nonshareholder surgeons received only a
fixed monthly salary.  P deducted the amounts paid to
the shareholder surgeons as "officers compensation".

        R disallowed a portion of such deductions on the
ground that a portion of the amounts paid to the
shareholder surgeons was a dividend rather than
officers' compensation.  R also determined that P was
subject to a sec. 6662, I.R.C., accuracy-related
penalty for each of the years in question.  Ultimately,
R sharply reduced his proposed deficiencies to amounts
determined to represent P's profits attributable to
services rendered by the nonshareholder surgeons.  P

claims that R's revised deficiency determinations constitute the raising of "new matters" with respect to which R bears the burden of proof.

1. Held: R has not raised new matters, and, therefore, the burden of proof remains with P.

2. Held, further, R's disallowance of a portion of P's deductions for shareholder compensation is sustained in part.

3. Held, further, the penalties are sustained.

Robyn A. Frohlin, for petitioner.

James R. Turton, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: By notice of deficiency dated June 25, 1998 (the notice), respondent determined deficiencies in petitioner's Federal income tax and accuracy-related penalties as follows:

| Tax Year Ending December 31 | Deficiency | Sec. 6662(a) Penalty |
|---|---|---|
| 1994 | $206,455 | $41,291 |
| 1995 | 287,606 | 57,521 |

The principal adjustments giving rise to those deficiencies (the principal adjustments) are respondent's disallowance for each year of a portion of the deduction claimed by petitioner for compensation paid for services. The amounts disallowed (disallowed amounts) are $598,710 and $805,469, for 1994 and

1995, respectively (the audit years).[1]  On brief, respondent concedes the deductibility of all but $140,776 and $19,450 of the disallowed amounts.  We accept such concession, and, thus, with respect to the principal adjustments, we need decide only the deductibility of such remaining amounts for the audit years.

Petitioner also argues that, because respondent's rationale with respect to the principal adjustments changed subsequent to the notice, respondent has raised a "new matter" with respect to the principal adjustments, with respect to which respondent bears the burden of proof.

Finally, we must also decide whether petitioner is liable for the accuracy-related penalties determined under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

---

[1]  The deficiencies also reflect adjustments to petitioner's deductions for FICA taxes and charitable contributions, which are derivative of the principal adjustments and are not directly disputed by petitioner.  We do not further discuss those adjustments.

Petitioner

Petitioner, a Texas corporation, was organized in 1976 by Drs. Richard Ellis and Charles M. Mann, Jr. It is a personal service corporation. It provides pediatric surgical services in the area of Fort Worth, Texas. Pediatric surgery is a surgical subspecialty limited to surgical procedures on infants and children. During the audit years, petitioner employed approximately 20 individuals, including six pediatric surgeons. During those years, it maintained three offices.

Petitioner's patient base consists, primarily, of patients referred to petitioner by pediatricians. Petitioner's employee surgeons perform almost all of their surgery at Cook Children's Medical Center (the hospital), in Fort Worth, Texas. Petitioner also has an arrangement with the hospital to provide on-call surgical services in the hospital's emergency room.

Petitioner's business is the only pediatric surgical business in the Fort Worth, Texas, area.

Petitioner computes taxable income under the cash receipts and disbursements method of accounting.

Petitioner has never declared a dividend.

Shareholder Surgeons

During the audit years, the shares of stock of petitioner were owned exclusively by individuals who were also employed by petitioner as surgeons. From January 1, 1994, through June 30,

1995, those individuals were:  Drs. Ellis, Mann, James P. Miller, and Timothy L. Black (collectively, the shareholder surgeons). On June 30, 1995, Dr. Ellis ceased to be a shareholder, and, from July 1, 1995, to December 31, 1995, petitioner was owned equally by the three remaining shareholder surgeons.

Drs. Mann, Miller, and Black were employees of petitioner for all of 1994 and 1995.  Dr. Ellis was an employee of petitioner for all of 1994 and until June 30, 1995.

Shareholder Surgeon Employment Contracts

With respect to their relative periods of employment during the audit years, the shareholder surgeons were all employed by petitioner pursuant to agreements containing similar terms (sometimes, the shareholder employment agreements).  Among other things, the shareholder employment agreements provide:  The relationship between petitioner and the shareholder surgeon "shall be that of an employer and an employee".  The agreement is to continue from year to year if such is mutually agreeable to the shareholder surgeon and the board of directors of petitioner (the board).  The shareholder surgeon "is employed to engage exclusively, and actively in the practice of medicine on behalf of the Association."  The shareholder surgeon "shall devote full time and attention to rendering professional services on behalf of the Association and in furtherance of its best interests".  The shareholder surgeon has, however, the option of working less

than full time, but not less than 6 months a year.  Without permission, he is prohibited from practicing medicine except as an employee of the corporation.  Petitioner has the power to determine both the specific duties performed by the shareholder surgeon and the means and manner of performing those duties.  Petitioner has the power to determine the assignment of patients to the shareholder surgeon.  "All fees, compensation, and other things of value, charged by the Association and received or realized as a result of the rendition of services by * * * [the shareholder surgeon] shall belong to and be paid and delivered forthwith to the Association."  Base compensation is $16,500 a month.  The shareholder surgeon "may be paid cash bonuses in such amounts and at such times and on such basis as the Board of Directors may from time to time, in its absolute discretion, determine."  For less than full-time shareholder employees, base compensation and bonuses "shall be reduced to equal a percent, the numerator being the minimum number of months per twelve-month period set forth in such notice [of intent to work less than full time] and the denominator being twelve months."

The shareholder employment agreements with respect to Drs. Miller and Black (but not Drs. Ellis and Mann) provide that, if the shareholder surgeon's employment terminates prior to July 1, 1996, and he continues either the practice of medicine, or to

have hospital privileges, in Tarrant County, Texas, he must pay petitioner $5,000 a month until 96 months have passed.

Cash Bonuses

In the middle of each month, petitioner would determine the amount remaining in its bank account and the amount of cash necessary to meet anticipated cash-flow needs for the immediate and near future. The balance in the account, if any, was paid out, in equal amounts, as bonuses to the shareholder surgeons, pursuant to the shareholder employment agreements.

Audit Year Compensation of Shareholder Surgeons

On petitioner's U.S. Corporation Income Tax Returns, Forms 1120 (Forms 1120), for the audit years, petitioner deducted compensation paid to shareholder surgeons under the heading "Compensation of officers", in the following amounts:

|            | 1994      | 1995      |
|------------|-----------|-----------|
| Dr. Ellis  | $239,866  | $172,896  |
| Dr. Mann   | 347,968   | 452,969   |
| Dr. Miller | 355,391   | 450,485   |
| Dr. Black  | 357,006   | 451,775   |
| Total      | 1,300,231 | 1,528,125 |

All such payments were subjected to appropriate wage withholding and were reported on Forms W-2, Wage and Tax Statements, issued by petitioner to the shareholder surgeons.

Nature of Petitioner's Income From Shareholder Surgeons

All of the income received by petitioner on account of the employment of the shareholder surgeons was received on account of the provision of medical services by those shareholder surgeons.

Nonshareholder Surgeons

Petitioner also employs nonshareholder surgeons. Typically, a nonshareholder surgeon is hired for a period of 2 years. During that 2-year period, a nonshareholder surgeon is expected to obtain his certification as a pediatric surgeon, meet members of the medical community, and become part of the established referral network. At the end of the 2-year period, a nonshareholder surgeon may purchase from the existing shareholder surgeons an equal interest in the shares of petitioner and, thus, become a shareholder surgeon. Both Drs. Miller and Black followed that path to becoming shareholder surgeons.

During the audit years, petitioner employed two surgeons who were not shareholders: Dr. Charles Snyder, from July 15, 1992, until July 14, 1994, and Dr. Glaze Vaughan, from July 1, 1995, until June 30, 1997 (collectively, the nonshareholder surgeons). Dr. Vaughan, but not Dr. Snyder, became a shareholder surgeon at the end of the period described.

The employment of the nonshareholder surgeons was governed by employment agreements with similar terms (the nonshareholder employment agreements). Among those terms are the following: The term of the agreement is 2 years, but shall continue on a year-to-year basis if the board agrees to accept the nonshareholder surgeon as a partner. The monthly salary of each (for the term) is fixed, $12,000 for Dr. Snyder and $12,500 for

Dr. Vaughan. No bonuses are payable. Each is to engage in the practice of medicine on behalf of, and exclusively for, petitioner, in furtherance of its best interests. Petitioner is to furnish each with an office, stenographic help, supplies, equipment and other facilities and services adequate for the performance of duty. At the conclusion of the 2-year employment period, each has the option to purchase shares in the corporation at a price based on accounts receivables and the fair market value of petitioner's assets.

Each of the nonshareholder employment agreements has a noncompete clause: With respect to Dr. Snyder, for an 8-year period beginning on the effective date of his employment, if his employment terminated for any reason other than death or disability, and if he continues either the practice of medicine, or to have hospital privileges, in Tarrant County, Texas, he is obligated to pay petitioner $6,000 a month until 96 months have passed. Dr. Vaughan is similarly restricted, except the term of his restriction is 3 years, and the monthly penalty is $8,000.

For 1994, Dr. Snyder received a salary of $72,000, and, for 1995, Dr. Vaughan received a salary of $76,061. Petitioner incurred expenses in connection with the employment of the nonshareholder surgeons during the audit year.

The nonshareholder surgeons had no significant duties with respect to the administration of petitioner.

Other Staff

Petitioner employs individuals who are not surgeons. During the audit years, petitioner had 12 to 14 employees on its office staff.

Fee Schedule

Petitioner established a schedule of fees for the services provided by its surgeon employees (the fee schedule). The term "gross billing" refers to the practice of billing for services according to the fee schedule. Normally, petitioner did not engage in gross billing. The term "net billing" refers to the practice, generally engaged in by petitioner, of billing only a negotiated percentage of the amount found on the fee schedule. Such negotiations were carried out, for instance, with third-party payers, such as health maintenance organizations. The term "collections" refers to the amount, less than 100 percent, actually collected by petitioner with respect to billings.

Collections

For 1994, there are no reliable records of collections attributable to specific surgeon employees of petitioner's. For 1995, collections attributable to each of petitioner's surgeon employees were as follows:[2]

---

[2] Even though Dr. Snyder left petitioner in July 1994, petitioner's records indicate that there were collections attributable to his services through 1997.

Dr. Ellis        $351,120.98
Dr. Mann          519,396.47
Dr. Black         592,821.01
Dr. Miller        772,752.38
Dr. Vaughan       125,467.35
Dr. Snyder          4,338.96

## Taxable Income

For 1994, on gross receipts of $2,080,008, petitioner reported taxable income of $29,255.  For 1995, on gross receipts of $2,405,718, petitioner reported taxable income of $49,323.

On its Forms 1120 for the audit years, petitioner reported the following deductions (other than compensation of officers):

|                        | 1994      | 1995      |
|------------------------|-----------|-----------|
| Salaries and wages     | $233,403  | $273,524  |
| Repairs and maintenance| 3,329     | 8,930     |
| Rents                  | 62,353    | 57,954    |
| Taxes and licenses     | 52,013    | 64,176    |
| Interest               | 2,278     | 174       |
| Contributions          | 3,251     | 5,480     |
| Depreciation           | 33,398    | 27,592    |
| Pension, etc.          | 138,207   | 134,917   |
| Other deductions*      | 238,032   | 268,867   |

*The largest items were insurance, $135,770 and $113,889, for 1994 and 1995, respectively.

## Assets

Balance sheets prepared for petitioner for the audit years show the following assets:

|                        | 1994      | 1995      |
|------------------------|-----------|-----------|
| Current assets         |           |           |
| Cash in banks          | $30,797   | $6,894    |
|                        |           |           |
| Property and equipment |           |           |
| Office equipment       | 139,110   | 148,451   |
| Accum. depr.           | (108,215) | (124,609) |
| Leasehold improv.      | 39,820    | 41,073    |
| Accum. amort.          | (28,658)  | (29,064)  |

| Med. & surg. equip. | 14,766 | 14,766 |
| Accum. depr. | (14,766) | (14,766) |
| Automobiles | 143,767 | 115,751 |
| Accum. depr. | (76,690) | (29,455) |
| | | |
| Other assets | | |
| Accrued int. exp. | | 348 |
| Prepaid rent | 1,274 | 1,274 |
| | | |
| Total assets | 141,206 | 130,662 |

OPINION

I. Burden of Proof

A. Introduction

Petitioner claims that, with respect to the principal adjustments, respondent has raised a new matter, and, therefore, with respect to that matter, respondent bears the burden of proof.  We disagree that respondent has raised a new matter.

B. Rule 142(a)

Rule 142 governs the burden of proof.[3]  In pertinent part, Rule 142(a) provides:  "The burden of proof shall be upon the petitioner, * * * except that, in respect of any new matter, * * * it shall be upon the respondent."

---

[3]  The Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 685, 727, added sec. 7491, which shifts the burden of proof to the Secretary in certain circumstances.  Sec. 7491 is applicable to "court proceedings arising in connection with examinations commencing after the date of the enactment of this Act."  RRA 1998, sec. 3001(c).  RRA 1998 was enacted on July 22, 1998, which date is after the date (June 25, 1998) of respondent's notice of deficiency in this case.  Accordingly, sec. 7491 is inapplicable to this case.

- 13 -

With respect to what constitutes a new matter, we have
stated: "A new theory that is presented to sustain a deficiency
is treated as a new matter when it either alters the original
deficiency or requires the presentation of different evidence."
Shea v. Commissioner, 112 T.C. 183, 191 (1999) (quoting Wayne
Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989)).

C. Notice and Pleadings

1. Notice

The notice contains the following explanation of the
principal adjustments:

> It is determined that the deductions of $1,300,231.00
> in 1994 and $1,528,125.00 in 1995 for officers
> compensation are decreased $598,710.00 and $805,469.00,
> respectively, because it has not been established that
> any amounts greater than $701,521.00 in 1994 and
> $722,656.00 in 1995, * * * were for officers
> compensation.  It has been established that the
> unallowed amounts were a distribution of earnings and
> profits to stockholder doctors.  Accordingly, your
> taxable income is increased $598,710.00 in 1994 and
> $805,469.00 in 1995.

2. Petition

By the petition, petitioner sets forth the following
disagreement with respondent's adjustments:

> Taxpayer disagrees with all changes and resulting tax
> * * * for years 1994 and 1995.  Auditor limited
> deductible officers' salaries based on his theory that
> reasonable doctors' salaries were established by the
> salary paid to the new, less experienced non-officer
> doctor.  There is no tax law to validate auditor's
> theory and none was presented to taxpayer during the
> audit.  * * *

### 3. Answer

In the answer, with respect to the quoted language from the petition, respondent admits the first sentence and denies the remainder of the paragraph.

### D. Petitioner's Claim

With respect to the notice, petitioner makes reference to section 162(a), which, in pertinent part, states:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) In general.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

Petitioner claims: "The only issue reasonably inferred from the wording of * * * [the notice] is one of reasonable compensation. That is, whether the money paid to the shareholder surgeons as salary was reasonable such that Petitioner's deductions of these payments was [sic] proper under I.R.C. § 162(a)." Petitioner argues that respondent has raised a new issue because he has changed his theory of the case: "Respondent's new theory * * * is that Petitioner paid a dividend to the shareholder surgeons equal to the actual collections of the non-shareholder doctors minus the costs and overhead allocable to the non-shareholder doctors."

- 15 -

E.  Discussion

By the notice, respondent explains the principal adjustments on the grounds that petitioner has failed to establish that the disallowed amounts "were for officers compensation."  Further, respondent avers that the disallowed amounts "were a distribution of earnings and profits to * * * [the shareholder surgeons]".  Although section 162(a) is not mentioned in the notice, its provisions are implicit in respondent's explanation that petitioner has failed to establish that the disallowed amounts were for officers' compensation.  It is not implicit in the notice, however, that respondent has denied a deduction for officers' compensation exclusively because petitioner has failed to establish that such compensation was reasonable in amount.

Section 162(a)(1) establishes a two-pronged test for the deductibility of payments purportedly paid as salaries or other compensation for personal services actually rendered (without distinction, compensation for services).  To be deductible as compensation for services, the payments must be (1) "reasonable" and (2) "in fact payments purely for services."  Sec. 1.162-7(a), Income Tax Regs.; see also Nor-Cal Adjusters v. Commissioner, T.C. Memo. 1971-200, affd. 503 F.2d 359 (9th Cir. 1974).  If anything, the notice indicates that it is the second prong--that the disallowed amounts were not, in fact, payments purely for services--that concerned respondent.  The notice explains

respondent's adjustment on the grounds that the disallowed amounts were a distribution of earnings and profits. By the petition, petitioner avers that respondent's theory is exclusively a "reasonable compensation" theory. By the answer, respondent denies that averment. Petitioner has failed to prove that respondent's notice theory is exclusively a reasonable compensation theory and is not premised on a failure by petitioner to establish that the disallowed amounts were paid purely for services.

Respondent's position on brief is that a portion of what petitioner has treated as compensation to the shareholder surgeons is profit attributable to services performed by the nonshareholder surgeons, which should be treated as a nondeductible, disguised dividend rather than as deductible compensation. Respondent has not raised a new matter. The notice fairly puts petitioner on notice that respondent is challenging the bona fides of the disallowed amounts as "officers compensation". Petitioner clearly understood that section 162(a)(1) was involved. Respondent's concession dramatically decreases the proposed deficiencies and, together with respondent's position on brief, delimits petitioner's obligation to prove compliance with the second prong of the section 162(a)(1) test.

Finally, petitioner invokes section 7522, which, among other things, states that deficiency notices in income tax cases "shall describe the basis for, and identify the amounts (if any) of, the tax due". The notice sets forth deficiencies in tax and, as noted in the preceding paragraph, describes the basis for that portion of the proposed deficiencies attributable to the principal adjustments as petitioner's failure to establish that the disallowed amounts were for officers' compensation. Respondent has complied with section 7522.

F. Conclusion

Respondent has not raised a new matter. Petitioner bears the burden of proof.

II. Deductibility of Payments to Shareholder Surgeons

A. Introduction

Petitioner, a cash method taxpayer, paid its four shareholder surgeons $1,300,231 and $1,528,125 during 1994 and 1995, respectively, and deducted such amounts (the return amounts) as officers' compensation on its Federal income tax returns for such years. After initially disallowing $598,710 and $805,469 of such deductions, respondent now agrees that petitioner may deduct $1,159,455 and $1,508,675 for 1994 and 1995, respectively, as compensation for services. That leaves for our decision respondent's disallowance of deductions for

officers' compensation in the amounts of $140,776 and $19,450, for 1994 and 1995, respectively (the remaining amounts).

Section 162(a)(1) (set forth supra in section I.D.) allows a deduction for payments of "a reasonable allowance for salaries or other compensation for personal services actually rendered". Respondent's ground for disallowing petitioner's deduction for the remaining amounts is that such amounts are disguised dividends rather than compensation for services.

B. Question Before Us

1. Introduction

As discussed supra in section I.D., section 162(a)(1) establishes a two-pronged test for determining whether a payment is deductible as compensation for services. The payment must be both reasonable and, in fact, purely for services. In part, the parties have directed their arguments to the reasonableness aspect of that test. We do not believe, however, that whether the return amounts were reasonable in amount is actually in question.[4] The question framed by the parties' briefs is whether the remaining amounts were paid to the shareholder surgeons purely for their services. In respondent's opening brief, respondent relies on the following point: "The respondent

---

[4] For 1995, petitioner deducted $1,508,675 as officers' compensation, and, after concessions, respondent would disallow $19,450, which is 1.29 percent of the amount deducted. We hesitate to conclude that respondent would ask us to find that compensation was unreasonable based on such a small variance.

contends that in 1994 and 1995, the petitioner is entitled to deduct as wages the actual collections of the shareholder-employees, less their share of the petitioner's expenses."   In petitioner's opening brief, petitioner argues for a "per se" rule, that the payments to the shareholder surgeons were reasonable in amount because they did not exceed petitioner's profits, calculated by subtracting from petitioner's gross receipts (which were exclusively from providing services) all corporate expenses except officers' compensation.  Petitioner makes the same argument in different terms in its answering brief:  "Petitioner's shareholder surgeons were paid compensation in an amount less than their gross collections, which proves that they were reasonably compensated."   The disagreement between the parties is over how much the shareholder surgeons received for their services, not whether that amount, when finally determined, is reasonable.

To prevail, petitioner must show that the remaining amounts were paid to the shareholder surgeons purely for their services. As a preliminary matter, petitioner's principal arguments raise questions of law.

2. Questions of Law

a. Bianchi v. Commissioner

Petitioner argues:

[T]he best evidence of value of services provided in a professional personal service corporation is the profit

made by the corporation.  Thomas A. Curtis, M.D., Inc. v. Commissioner, 67 T.C.M. (CCH) 1958, 1963 (1994) [T.C. Memo. 1994-15]; LaMastro v. Commissioner, 72 T.C. 337, 384 (1979).  The Tax Court in LaMastro, relying on Bianchi v. Commissioner, 66 T.C. 324 (1976), aff'd. per curium [sic], 553 F.2d 93 (2nd Cir. 1977), held that the best evidence of the value of a dentist's personal services is the profit derived from the practice.  Id. at 383.

In Bianchi v. Commissioner, supra at 333, we held that it is proper to examine the prior self-employment earnings of a corporate employee to determine whether compensation currently paid to such employee by the corporation is reasonable. In Bianchi, the corporate employee, a dentist, had incorporated his individual proprietorship, transferring to the corporation (which elected status as an S corporation) the equipment previously used in the proprietorship, accounts receivable, and good will.  See id. at 325.  In determining what would be reasonable compensation for his services provided to the corporation, we said:  "It cannot be questioned that the clearest evidence of the worth of petitioner's services is petitioner's earnings from his dentistry practice as an individual proprietor."  Id. at 333.  It is clear that, in referring to "petitioner's earnings", we were referring to the profit earned by the dentist as an individual proprietor.  Indeed, we restated our point as follows:  "[T]he best evidence of the value of his personal services is profit he derived from his own practice." Id. at 335 (emphasis added).  Undoubtedly, we were using the term

"profit" to refer to the excess of the dentist's receipts from his practice of dentistry over the costs of earning those receipts but without any reduction for the value of the dentist's own services.  The case, thus, reflects the unremarkable proposition that the return to an individual proprietor equals the receipts of the proprietorship less the expenses of the proprietorship, viz, the "profit" of the proprietorship.

That proposition was useful to us in Bianchi because we assumed that (1) the proprietorship in question provided a service, (2) all of the proprietorship's income resulted from the provision of that service, and (3) the proprietor was the sole service provider employed by the proprietorship.  We were, thus, able to determine the value of the services provided by the individual proprietor to his proprietorship, and to use the result to test the reasonableness of the compensation paid to him by his wholly owned corporation.

We cannot analogize petitioner to an individual proprietorship and employ the stated proposition to find that the value of the services provided by the shareholder surgeons to petitioner is equal to the profit made by petitioner (determined without any deduction for the compensation of the shareholder surgeons).  One reason why we cannot do so is that the shareholder surgeons were not the only service providers employed by petitioner.  There were also the nonshareholder surgeons,

whose contribution to petitioner's profit we cannot assume to be zero.

Petitioner does not prevail, as a matter of law, based on Bianchi v. Commissioner, supra.

b.   Richlands Med. Association v. Commissioner

Petitioner refers us to one of our memorandum opinions, Richlands Med. Association v. Commissioner, T.C. Memo. 1990-660, affd. without published opinion 953 F.2d 639 (4th Cir. 1992), for the following proposition:  Specifically, the Tax Court held "petitioner's associates were entitled to receive, as compensation for their services to patients, 100 percent of the collections recorded by petitioner as attributable to such services."  In Richlands Med. Association, we did so find.  We did that, however, after finding that respondent, in his notice of deficiency, had allowed such amounts as a deduction for compensation.

In Richlands Med. Association, the taxpayer not only provided physician's services but also owned a hospital that provided medical services ancillary to physician's services. With respect to the taxpayer's system of compensation, under which all funds left after the payment of expenses and the establishment of reserves were distributed to its associates (owner employees), we observed that the taxpayer's expert, an accountant, was unable to explain how the taxpayer could ever

earn a profit. Nevertheless, we allowed a deduction for compensation to associates in excess of the amounts recorded as attributable to patient services to reflect additional services provided by the associates to the association. Because a portion of the taxpayer's profit was attributable to "ancillary hospital service charges" that were not shown to be allocable to the associates, we held that a portion of what the taxpayer treated as compensation to the associates was, in fact, a nondeductible distribution of profits. Richlands Med. Association does not establish a rule of law that, in all circumstances, an employer may deduct as compensation paid to an employee amounts collected for services performed by such employee.

### 3. Relevant Inquiry

Section 1.162-7(b)(1), Income Tax Regs., states: "Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible." The regulations further provide that an ostensible salary may, if paid by a corporation, be a distribution of a dividend on stock, or may be in part a payment for property. See id. Petitioner must prove its intent (i.e., the intent of the members of the board) to pay compensation. See, e.g., Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. per curiam 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without published opinion 496 F.2d 876 (5th Cir.

1974).  Whether such intent has been demonstrated is a factual question to be decided on the basis of the particular facts and circumstances of the case.  Electric & Neon, Inc. v. Commissioner, supra at 1059.

We turn now to that factual question.

C.  Discussion

    1.  Petitioner's Principal Argument

Petitioner's principal argument is:

> In the instant case, the payments made to the shareholder surgeons were clearly compensation for services rendered and not disguised dividends. Petitioner issued W-2 forms to its shareholder surgeons and that income was duly reported on the surgeons' personal tax returns. * * * Moreover, the salary payments were properly deducted as such on Petitioner's tax returns.

Petitioner's treatment of the reported amounts is consistent with the board's intending such amounts to constitute payments purely for services.  Nevertheless, since the shareholder surgeons owned petitioner, the board was not necessarily concerned that shareholder surgeon compensation not be overstated.  See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980) ("Where officers-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits.")  Petitioner also argues that the shareholder employment agreements pegged base compensation and bonuses to the number of months worked during the year, which,

petitioner argues, signifies compensation for services.  A payment pegged to time worked may be nothing more than a payment for services.  It may, however, include a distribution of profits, if the only recipients of such payments are the owners of the enterprise.  Cf. Klamath Med. Serv. Bureau v. Commissioner, 29 T.C. 339, 348-349 (1957) (payments in proportion to billings, but in excess of billings, were held to be, in part, disguised dividends), affd. 261 F.2d 842 (9th Cir. 1958).  Here, all of the recipients of such payments were shareholders of petitioner (shareholder surgeons).  Three were full-time employees, entitled to equal payments, while the fourth was a part-time employee, entitled to a proportionate payment.  That disparity does not eliminate the possibility of a disguised distribution of profit, but may reflect only an implicit redistribution of ownership upon the decision of a shareholder surgeon partially to retire.

We must determine whether there was a disguised distribution of profit by petitioner to the shareholder surgeons.

   2.  Profit Attributable to Nonshareholder Employment
       Agreements

Petitioner's gross receipts in each of the audit years exceeded $2 million.  Balance sheets prepared for petitioner for those years list as assets only cash, office equipment, leasehold improvements, medical and surgical equipment, automobiles, prepaid rent, and accrued interest (the balance-sheet assets),

with an unrecovered cost of $141,206 and $130,622, for 1994 and 1995, respectively. It is unlikely that, by themselves, the balance-sheet assets account for $2 million in gross receipts. In addition to the balance-sheet assets, however, petitioner had assets not shown on its balance sheets (the nonbalance-sheet assets), viz, both the shareholder and nonshareholder employment contracts, petitioner's arrangement with the hospital to provide on-call services in the hospital's emergency room, and the goodwill that petitioner undoubtedly built up during its almost 20 years of business in the Fort Worth area. Together, the balance-sheet and nonbalance-sheet assets account for the in-excess-of $2 million in gross receipts that petitioner reported for each of the audit years. Respondent concedes (and petitioner does not disagree) that petitioner made no profit on the shareholder employment agreements. As stated supra, in section II.B.1, respondent is willing to allow petitioner to deduct, as compensation for services, collections attributable to the shareholder surgeons less their allocable share of petitioner's expenses. Respondent believes, however, that petitioner has understated its profit on the nonshareholder employment agreements by both understating its collections with respect to such agreements and overstating its overhead allocable to such agreements. For 1994, respondent would reallocate collections from the shareholder employment agreements to the nonshareholder

employment agreements and, for both 1994 and 1995, overhead from the nonshareholder employment agreements to the shareholder employment agreements. That would have the effect of reducing petitioner's deduction for compensation paid to officers (and increasing its taxable income for each of the audit years). Respondent's position is:

> [P]etitioner can deduct as wages the actual net collections of the shareholder-doctors in 1994 and 1995. The way to arrive at the allowable deductions, since petitioner's records were unreliable, was to subtract from the total compensation paid to the share-holder doctors the net collections of the non-shareholder doctors. * * *

### 3. Determination of Profits Attributable to Nonshareholder Surgeons

#### a. Introduction

Petitioner is contradictory in its calculation of any profit attributable to the nonshareholder surgeons. In one exhibit, petitioner calculates the profit attributable to Dr. Snyder in 1994 as $20,174 and to Dr. Vaughan in 1995 as $12,579. In another exhibit, petitioner claims that, for those years, it lost money by employing Drs. Snyder and Vaughan. Respondent computes the profit attributable to Drs. Snyder and Vaughan as the remaining amounts ($140,776 and $19,450, for 1994 and 1995, respectively). Neither party's position is persuasive on its face. The Court must make its own calculation.

During the pretrial conference and, again, at the conclusion of the trial, the Court elicited from respondent's counsel that

respondent's proposed deduction disallowance, for both 1994 and 1995, is limited to collections attributable to the nonshareholder surgeons less applicable direct costs and allocable overhead. On both occasions, the Court suggested that it would be helpful if the parties were able to stipulate as to the proper allocation of overhead attributable to collections generated by Drs. Snyder and Vaughan. To that end the Court agreed to leave the record open for 30 days for such stipulations by the parties. The parties failed to stipulate agreed allocations of overhead. It is therefore left to the Court to make the required overhead allocations, on the basis of the evidence in the record.

In his proposed findings of fact, respondent attempts to compute the portion of petitioner's total expenses attributable to Dr. Snyder for 1994 and to Dr. Vaughan for 1995. Respondent subtracts those allocated expenses, for 1994, from Dr. Snyder's deemed collections (considered by respondent to equal his net billings for that year) and, for 1995, from actual collections attributed to both Dr. Snyder and Dr. Vaughan, in order to derive the deemed dividend for each year. Petitioner objects to respondent's computation of Dr. Snyder's collections for 1994 and to respondent's allocations of expenses for both years. The expenses subject to allocation are those deducted on petitioner's

Forms 1120 for the audit years (other than compensation of officers).

b. <u>Collections</u>

The record does not contain reliable records of collections for 1994. At trial, respondent argued that, because Dr. Snyder's billings for 1994 "were paid, to an extremely large percent, by Blue Cross-Blue Shield or Medicare" it was appropriate to treat his collections as equal to his net billings for the year: $245,597. Exhibit 8-J, prepared by petitioner's accountant, alleges Dr. Snyder's 1994 collections to be $146,837. Neither of those conclusions is supported by the evidence, which consists mainly of Dr. Mann's testimony that petitioner's collections are "probably between 60 to 70 percent of * * * net billings". Because petitioner has not presented any evidence to the contrary, we shall assume that Dr. Snyder's collections for 1994 were at the high end of petitioner's estimated range, i.e., 70 percent of net billings, or $171,918. The parties have stipulated that collections attributable to Dr. Vaughan for 1995 were $125,467. We also find, based upon an attachment to petitioner's expert report, that collections attributable to Dr. Snyder for 1995 (to which no expenses are allocable because Dr. Snyder was not an employee during 1995) were $4,338.96.

- 30 -

c.  Expenses

Both parties' allocations of expenses to Dr. Snyder's
collections for 1994 and Dr. Vaughan's collections for 1995
consist of the salary paid to each plus one-tenth (one-fifth for
the one-half of the audit year during which each was employed) of
other expenses considered equally apportionable to the five
surgeons employed during each year.[5]  The parties differ,
however, as to whether certain of petitioner's expenses were at
all allocable to Drs. Snyder and Vaughan.  We accept respondent's
proposed allocation of expenses as reasonable with the following
additional allocations:  There should be a pro rata (one-tenth)
allocation of rent, repair and maintenance expense, depreciation
of office equipment (other than shareholder automobiles),
telephone expenses, and equipment lease expenses to the
nonshareholder surgeons' collections.[6]  Thus, for the audit

_____

[5]  Although respondent attempted to elicit testimony from
Dr. Mann that the nonshareholder surgeons might not have utilized
office space and staff to the same degree as the shareholder
surgeons, there is no evidence in the record that would enable
the Court to make a specific finding in that regard.  We also
ignore as immaterial the fact that Dr. Ellis was employed for
only 6 months during 1995.

[6]  As noted, supra in our findings of fact, the
nonshareholder surgeons' employment contracts obligated
petitioner to furnish its nonshareholder surgeons with "an
office, stenographic help, supplies, equipment, and such other
facilities and services * * * adequate for the performance of
* * * [their] duties."

years, we find that the proper expense allocations are as follows:

|  | 1994 | 1995 |
|---|---|---|
| Respondent's allocation | $100,482 | $110,356 |
| 1/10 of rent expenses | 6,235 | 5,795 |
| 1/10 of repair and maintenance | 333 | 893 |
| 1/10 of office equipment depreciation | 2,397 | 2,158 |
| 1/10 of telephone expenses | 1,237 | 1,168 |
| 1/10 of equipment lease expenses | -- | 399 |
| Total | 110,684 | 120,769 |

### d. Profit

For the audit years, we find that the net profit attributable to the nonshareholder surgeons was as follows:

|  | 1994 | 1995 |
|---|---|---|
| Collections | $171,918 | $129,806 |
| Expenses | (110,684) | (120,769) |
| Profit | 61,234 | 9,037 |

## D. Conclusion

We hold that the deductions claimed by petitioner for 1994 and 1995 for salaries paid to the shareholder surgeons exceed reasonable allowances for services actually rendered by them by the amounts of $61,234 and $9,037, respectively, and that such amounts, therefore, are not deductible by petitioner under section 162(a)(1). We sustain respondent's determination of a deficiency to the extent attributable to such disallowances.

## III. Accuracy-Related Penalty

Section 6662 provides for an accuracy-related penalty (the accuracy-related penalty) in the amount of 20 percent of the portion of any underpayment attributable to, among other things,

negligence or intentional disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement. Respondent determined the accuracy-related penalty against petitioner.  Although the notice indicates that respondent determined such penalty upon "one or more" of the three grounds described for such penalty, the issue presented by this case and our resolution thereof demonstrate that the only possible ground for imposition of the penalty is negligence.  Negligence has been defined as lack of due care or failure to do what a reasonable and prudent person would do under like circumstances.  See, e.g., Hofstetter v. Commissioner, 98 T.C. 695, 704 (1992).  Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment if it is shown that the taxpayer acted in good faith and that there was reasonable cause for the underpayment.  The determination of whether a taxpayer acted in good faith and with reasonable cause is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of * * * law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer."  Sec. 1.6664-4(b)(1), Income Tax

Regs.  Petitioner bears the burden of proving facts showing good faith and reasonable cause.  See Rule 142(a).

The same circumstances that led to our finding that a portion of the bonuses paid to the shareholder surgeons constituted a disguised dividend rather than a payment purely for services rendered by them also lead us to sustain respondent's imposition of the section 6662(a) penalty.  When asked during the trial why petitioner had never paid a dividend, Dr. Mann responded:  "Well, we are not a very big organization and all of our income comes from just the work we did.  And we just treated everything as salary."  But Dr. Mann's professed good faith belief that the monthly bonus payments of all available earnings reasonably represented payments for services rendered by the shareholder surgeons is belied by his later testimony that, within a short time after they arrive (and, certainly, within the 2-year employment period), the nonshareholder  surgeons also "made money" for petitioner.  Given that Dr. Mann and, by implication, the other shareholder surgeons were aware that at least a portion of petitioner's profits were attributable to services performed by the nonshareholder surgeons, we are not persuaded that petitioner's treatment of its distribution of

essentially all profits[7] to the shareholder surgeons as salary for services performed by them was based upon a good faith belief that such was the case. Cf. Comenout v. Commissioner, T.C. Memo. 1982-40, affd. 746 F.2d 1484 (9th Cir. 1984).

Although it happened that, for the audit years, profits attributable to the nonshareholder surgeons were small (and, for 1995, practically nil), such need not have been the case. For example, in 1996, collections attributable to Dr. Vaughan (still a nonshareholder surgeon), totaled just under $460,000 as compared to $491,000 for Dr. Mann. Under such circumstances, the shareholder surgeons could not reasonably conclude that all pre-distribution profits were solely attributable to services performed by them and, therefore, available for bonus payments to them. It is the shareholder surgeons' utter indifference to the possibility that a portion of the annual prebonus profits might have been derived from collections generated by nonshareholder surgeons that justifies respondent's imposition of the accuracy-related penalty in this case.

---

[7] Based upon Dr. Mann's testimony that the bonuses to the shareholder surgeons consisted of all available cash less the amount necessary to meet anticipated expenses, we find that the small amount of taxable income reported for each of the audit years ($29,255 for 1994 and $49,323 for 1995) was no more than the yearend set-aside needed to meet anticipated immediate and near-term expenses for the following year.

Accordingly, we find petitioner liable for the section 6662(a) penalty.

<u>Decision will be entered</u>

<u>under Rule 155</u>.