

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-15-2002

# Neonatology Assoc v. Commissioner IRS

Precedential or Non-Precedential: Precedential

Docket No. 01-2862

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Neonatology Assoc v. Commissioner IRS" (2002). *2002 Decisions*. Paper 502.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/502

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed July 29, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2862

NEONATOLOGY ASSOCIATES, P.A.

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-1201)

JOHN J. and OPHELIA J. MALL

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-1208)

ESTATE OF STEVEN SOBO, DECEASED and
BONNIE SOBO, EXECUTRIX, and
BONNIE SOBO, SURVIVING WIFE

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-2795)




AKHILESHI S. and DIPTI A. DESAI

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-2981)

KEVIN T. and CHERYL MCMANUS

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-2985)

ARTHUR and LOIS M. HIRSHKOWITZ

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-2994)

LAKEWOOD RADIOLOGY, P.A.

v.

COMMISSIONER OF INTERNAL REVENUE

(Tax Court No. 97-2995)

Neonatology Associates, P.A., John J.
and Ophelia Mall, Estate of Steven Sobo,
Deceased, and Bonnie Sobo, Executrix,
and Bonnie Sobo, Surviving Wife,
Akhilshi S. and Dipti A. Desai,
Kevin T. and Cheryl McManus,
Arthur and Lois M. Hirshkowitz and
Lakewood Radiology, P.A.,

      Appellants

2

On Appeal from the United States Tax Court
(T.C. Nos. 97-1201/1208/2795/2981/2985/2994/2995)
Tax Court Judge: Honorable David Laro

Argued: July 11, 2002

BEFORE: SCIRICA and GREENBERG, Circuit Judges ,
and FULLAM, District Judge*

(Filed: July 29, 2002)

      Neil L. Prupis
      Lampf, Lipkind, Prupis,
       Petigrow & LaBue
      80 Main Street
      West Orange, NJ 07052

      Kevin L. Smith (argued)
      Hines Smith
      3080 Bristol Street, Suite 540
      Costa Mesa, CA 92626

      David R. Levin
      Wiley Rein & Fielding
      1776 K Street, N.W.
      Washington, D.C. 20006

       Attorneys for Appellants

      Eileen J. O'Connor
      Assistant Attorney General
      Kenneth L. Greene
      Robert W. Metzler (argued)
      Attorneys Tax Division
      Department of Justice
      Post Office Box 502

Washington, D.C. 20044

Attorneys for Appellee

---

3

Steven J. Fram
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033

Attorneys for Amici Curiae Vijay
Sankhla, M.D., Yale Shulman,
M.D., Boris Pearlman, M.D., Marvin
Cetel, M.D. and Barbara Schneider,
M.D.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on appeal from
decisions of the United States Tax Court entered April 9,
2001, in accordance with its opinion filed July 31, 2000,
upholding the determination of the Commissioner of
Internal Revenue that contributions made by appellants,
two professional medical corporations, Neonatology
Associates, P.A. and Lakewood Radiology, P.A., into
Voluntary Employees Beneficiary Program (VEBA) plans in
excess of the cost of term life insurance were taxable
constructive dividends to the physicians owning the
corporations and their spouses rather than employer
deductible expenses. See Neonatology Assoc., P.A. v.
Comm'r, 115 T.C. 43 (2000). We refer to the corporations
and individuals collectively as "taxpayers." The
consequences of the decisions were substantial for the
taxpayers inasmuch as the professional medical
corporations were denied deductions they had taken for the
contributions and the individuals were charged with
significant additional taxable dividend income. The court
held further that the individual taxpayers were liable for
accuracy-related negligence penalties under I.R.C.
S 6662(a).

Our examination of the record convinces us that the
contributions at the heart of this dispute were so far in

4

excess of the cost of annual life insurance protection that
they could not plausibly qualify as ordinary and necessary
business expenses in accordance with I.R.C. S 162. In

essence, the physicians adopted a specially crafted framework to circumvent the intent and provisions of the Internal Revenue Code by having their corporations pay inflated life insurance premiums so that the excess contributions would be available for redistribution to the individual shareholders free of income taxes. As correctly recognized by the Tax Court, these contributions were taxable disguised dividends and not deductible expenses. Moreover, as the individual taxpayers could not in good faith avail themselves of the reliance-on-professional defense, the Tax Court duly held them liable for the accuracy-related negligence penalties. Accordingly, for the reasons we elaborate in more detail below, we will affirm the decisions of the Tax Court.

II. BACKGROUND

The evidence at the trial disclosed the following facts. Neonatology is a New Jersey professional corporation owned by Dr. Ophelia J. Mall. Lakewood is a New Jersey professional corporation owned equally at the times material here by Drs. Arthur Hirshkowitz, Akhilesh Desai, Kevin McManus, and Steven Sobo until his death on September 23, 1993. Subsequently Dr. Vijay Sankhla, who is not a party to this action, purchased Sobo's interest. The spouses of the doctors, John Mall, Lois Hirshkowitz, Dipti Desai, Cheryl MacManus, and Bonnie Sobo, are parties to this action as the doctors and their spouses filed joint income tax returns. In addition, Bonnie Sobo is a party as executrix of her husband's estate.

Following the enactment of the Tax Reform Act of 1986 (TRA), Pub.L. 99-514, 100 Stat. 2085, insurance salesmen Stephen Ross and Donald Murphy formed Pacific Executive Services (PES), a California partnership designed to provides services to retirement plan administrators and employee benefit advisors unfamiliar with the impact of the TRA. See App. at 377. Specifically, Ross and Murphy devised a program to allow closely held corporations to "create a tax deduction for [ ] contributions to [an] employee

5

welfare benefit plan going in and a permanent tax deferral coming out." App. at 2672.

To achieve this end, PES created two voluntary employees' beneficiary associations, the Southern California Medical Profession Association VEBA (SC VEBA) and the New Jersey Medical Profession Association VEBA (NJ VEBA).1 A VEBA, as defined in I.R.C. S 501(c)(9), is a tax-exempt program providing members, their dependents, or designated beneficiaries with life, sick, accident, or other benefits "if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual."

Under the PES VEBA programs, each participating employer adopts its own plan, maintaining a trust account

and designating a trust administrator with exclusive control over all assets. The plan adoption agreement obligates employers to make, whether in the form of group insurance policies or group annuities, contributions towards the life insurance benefits of employees and their beneficiaries, based on a multiple of each employee's annual compensation. Benefits payable under any plan are paid solely from that plan's allocable share of the trust fund, and the participating employer, administrator, and trustee are not liable for any shortfall in the funds required to be paid. Upon termination of a plan, all its remaining assets are distributed to the employer's covered employees in proportion to their compensation. PES enlisted the services of Barry Cohen, a longtime insurance salesman with the Kirwan companies, to market the VEBA programs to medical professionals.

The SC VEBA plans at issue in this case, the Neonatology Employee Welfare Plan and the Lakewood Employee Welfare Plan, shared a common feature: both purchased continuous group (C-group) term policy certificates from the Inter-American Insurance Co. of Illinois, Commonwealth

_____

1. Notwithstanding what might be regarded as a geographical anamoly, only the SC VEBA is involved here. There was, however, an additional petitioner in the Tax Court, not a party on this appeal, Wan B. Lo, d/b/a Marlton Pain Control and Acupuncture Center, who established a plan under the NJ VEBA.

Life Insurance Co., and Peoples Security Life Insurance Co. The C-group product provided routine group term life insurance with an added component, a "special" conversion policy through which a covered employee, under certain circumstances,[2] could opt to convert his or her policy to an individual policy, the C-group conversion universalife (UL) policy. By converting from a C-group to an individual UL policy, the employee could access funds paid by the employer to the group policy that exceeded the applicable mortality charge, i.e. the cost of insurance. The excess funds, depending on the year in which the conversion takes place,[3] are paid out with interest as so-called "conversion credits."

In addition to being able to access surplus amounts, a policyholder upon conversion to the UL policy may borrow any amounts against his or her policies not required to keep the policies in force.[4] When the policyholder dies, the loans are to be repaid from the policy death benefits, which ordinarily are not subject to income tax. See I.R.C. S 101. Of course, by borrowing the money the taxpayer effectively would be withdrawing money the medical corporations paid for the conversion privilege on a tax free basis. Thus, as if

_____

2. Under the policies, conversion was allowed when group coverage ceased because (1) the employee ceased employment, (2) the employee

left the class eligible for coverage, (3) the underlying contract terminated, (4) the underlying contract was amended to terminate or reduce the insurance of a class of insured employees, or (5) the underlying contract terminated as to an individual employer or plan. See App. at 1836, 1846.

3. Under the applicable schedule, none of the conversion credit balance is transferred to the C-group conversion UL policy if conversion occurs in the C-group term policy's first year. However, if conversion takes place in the C-group term policy's fourth year or beyond, 95% of the conversion credit balance is transferred to the C-group conversion UL policy. Policyholders could not receive more than 95% of their conversion credit balance because a five percent commission was paid automatically to the insurance agent upon conversion. See App. at 2161-62, 4710, 4713.

4. Notably, the interest due on any loan policy was equal to the interest credited on the asset accumulation. In other words, there were no out-of-pocket costs to the debtor-policyholder. See App. at 2164. To hedge the attendant C-group product risks, Inter-American and Commonwealth reinsured with a third party.

by magic, cash derived from the corporations would be withdrawn without tax. Each of the physician taxpayers, other than Dr. Sobo, in fact converted at least one C-group term certificate to a special policy providing conversion credits. See App. at 426-29, 439-41.

Neonatology, on the basis of conversations between its principal, Dr. Mall, and Cohen, established the Neonatology Plan under the SC VEBA on January 31, 1991, effective January 1, 1991. Under the plan, each covered employee was to receive a life insurance benefit equal to 6.5 times the employee's compensation of the prior year. See App. at 434, 1807. John Mall, Dr. Mall's husband, was not a paid employee of Neonatology and thus was not eligible to join the plan. Nevertheless, Dr. Mall and PES, the plan administrator, allowed Mr. Mall to join the plan, making him eligible to receive a death amount commensurate to that payable under life insurance that he had owned outside the plan ($500,000). See Supp. App. at 108-09. The Neonatology Plan purchased three C-group life insurance policies, two on Dr. Mall's life and one on Mr. Mall's life. See App. at 434-39. Neonatology contributed to the Neonatology Plan during each year from 1991 through 1993 and, for each subject year, claimed a tax deduction for those contributions and other related amounts.

Lakewood, on the basis of conversations between its principals and Cohen, established the Lakewood Plan under the SC VEBA on December 28, 1990, effective January 1, 1990. Under the plan, each covered employee was to receive a life insurance benefit equal to 2.5 times his or her prior-year compensation. See App. at 387. Lakewood amended its plan as of January 1, 1993, to increase the compensation multiple to 8.15. The Lakewood Plan purchased 12 C-group life insurance policies on the lives of Drs. Hirshkowitz, Desai, Sobo, McManus, and Sankhla and

three group annuities toward future premiums on the policies. See App. at 400-26. Lakewood also purchased three C-group policies outside of the Lakewood Plan. The individual owners on their own behalf determined the amounts contributed by Lakewood to the SC VEBA. See App. at 1015-16, 3674-87. For each subject year, Lakewood claimed a tax deduction for those contributions and other related amounts.

The IRS audited Neonatology's tax returns for calendar years 1992 and 1993 and Lakewood's tax returns for fiscal year 1991 (ending October 31, 1991) and calendar years 1992 and 1993. As a consequence of the audits, the Commissioner made the following determinations. First, with respect to the deductions claimed by Neonatology for amounts paid to the SC VEBA and by Lakewood for amounts paid to the SC VEBA and to the three non-plan C-group policies, he allowed only the cost of annual term life insurance protection and disallowed the excess amounts of $43,615 and $986,826 for Neonatology and Lakewood respectively. See App. at 2265-66, 2283-85. The Commissioner based his disallowance on alternative bases: (1) the excess contributions were not ordinary and necessary business expenses under I.R.C. S 162(a); (2) even if the amounts constituted ordinary and necessary business expenses, they nevertheless were not deductible under I.R.C. SS 404(a) and 419(a), which limit the deductibility of contributions paid to deferred compensation plans and welfare benefit plans. See App. at 2266, 2285.5

Second, the Commissioner determined with respect to the individual owners that amounts paid to the SC VEBA program increased personal incomes by $39,343 for Dr. Mall and her husband, $219,806 for Dr. Desai, $56,107 for Dr. McManus, $601,849 for Dr. Hirshkowitz, and $101,314 for Dr. Sobo (his estate). See App. at 2271, 2311, 2297, 2320. The Commissioner included the excess contributions as income to the individual taxpayers on alternative bases: (1) the amounts were deposited in the plans for the economic benefit of the individual taxpayers and as such constituted constructive dividends under I.R.C.SS 61(a)(7) and 301; (2) assuming that the Neonatology and Lakewood Plans constituted deferred compensation plans, the excess contributions were includible under section 402(b). See

---

5. Specifically, the Commissioner ruled that as deferred compensation plans, the Neonatology and Lakewood Plans did not satisfy the I.R.C. S 404(a)(5) "separate account" requirement for the contributions to be deductible. If the plans were characterized as welfare benefit funds, I.R.C. S 419(b) limited the deductions as the plans could not qualify for the "10-or-more-employer plans" exception to section 419(b) in I.R.C. S 419A(f)(6).

App. at 2271, 2297, 2311, 2320. Lastly, the Commissioner determined that by reason of the underpayment of taxes the individual taxpayers were subject to penalties under I.R.C. S 6662(a).

Neonatology, Lakewood, and the individual owners petitioned the Tax Court challenging the IRS's determinations. After a bench trial, the court sustained the Commissioner on the ground that:

> The Neonatology Plan and the Lakewood Plan are primarily vehicles which were designed and serve in operation to distribute surplus cash surreptitiously (in the form of excess contributions) from the corporations for the employee/owners' ultimate use and benefit . . . . The premiums paid for the C-group term policy exceeded by a wide margin the cost of term life insurance . . . . What is critical to our conclusion is that the excess contributions made by Neonatology and Lakewood conferred an economic benefit on their employee/owners for the primary (if not sole) benefit of those employee/owners, that the excess contributions constituted a distribution of cash rather than a payment of an ordinary and necessary business expense, and that neither Neonatology nor Lakewood expected any repayment of the cash underlying the conferred benefit.

Neonatology, 115 T.C. at 89-91.

Without addressing the alternative grounds for the Commissioner's conclusions, the court rejected taxpayers' arguments that the possibility of forfeiture in certain situations like policy lapse or death rendered all excess payments into de facto contributions to life insurance protection. Id. at 89-90 ("The mere fact that a C-group term policyholder may forfeit the conversion credit balance does not mean, as petitioners would have it, that the balance was charged or paid as the cost of term life insurance."). The court also rejected the idea that contributions which in fact did not fund term life insurance were paid as compensation for services, rather than dividends, because as a factual matter neither Neonatology nor Lakewood had the requisite compensatory intent when the contributions

10

were made. Id. at 93. Lastly, the court agreed with the Commissioner that the individual taxpayers were in fact negligent and could not circumvent the accuracy-related penalties by asserting a good faith, reliance-on-professional defense nor could they do so by claiming that the case involved tax matters of first impression.

The Tax Court entered its decisions on April 9, 2001. Taxpayers timely appealed on July 6, 2001. We have jurisdiction over this appeal pursuant to I.R.C.S 7482, and the Tax Court had jurisdiction over the petitions pursuant to I.R.C. SS 6213(a) and 7442.

III. DISCUSSION

There are three principal issues before us on appeal: (1) whether the Tax Court correctly determined that the amounts contributed in excess of the cost of per annum term life insurance were not ordinary and necessary business expenses and therefore not deductible; if yes, (2) whether those amounts constituted dividends, includible as taxable individual income, or compensation to the individual taxpayers; and, (3) whether the individual taxpayers were negligent. Our review of the Tax Court's legal conclusions is plenary and is based on the"clearly erroneous" standard for its findings of fact. See ACM P'ship v. Comm'r, 157 F.3d 231, 245 (3d Cir. 1998); Pleasant Summit Land Corp. v. Comm'r, 863 F.2d 263, 268 (3d Cir. 1988). Moreover, taxpayers bear the burden of refuting the IRS's determinations. See Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9 (1933).6

A. The Deficiencies

Section 162(a) of the Internal Revenue Code7 allows for

_____

6. The burden of proof may be shifted to the Commissioner in certain circumstances for audits conducted after July 22, 1998. See I.R.C. S 7491. These modifications to the Internal Revenue Code have no bearing on this case.

7. The Internal Revenue Code, I.R.C. S 162(a), provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

11

the deduction of all ordinary and necessary expenses incurred in carrying on a trade or business providing five requirements are met: the item claimed as deductible (1) was paid or incurred during the taxable year; (2) was for carrying on a trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense. See Comm'r v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352, 91 S.Ct. 1893, 1898 (1971). Beyond peradventure, employee benefits like life insurance are a form of compensation deductible by the employer.8 See Treas. Reg. S 1.162-10(a); see also Joel A. Schneider, M.D., S.C. v. Comm'r, 1992 T.C. Memo. 992-24, 63 T.C.M. (C.C.H.) 1787. To the extent, however, that Neonatology's and Lakewood's expenditures did not fund term life insurance, the Tax Court found that they did not meet the five requirements delineated above and therefore were not deductible. This factual finding was not clearly erroneous. See Comm'r v. Heininger , 320 U.S. 467, 475, 64 S.Ct. 249, 254 (1943).

The record amply supports the conclusion that taxpayers paid artificially inflated premiums in a creative bookkeeping ploy conceived by their insurance specialists to exploit what

they thought were loopholes in the tax laws. Indeed, we do not see how a court examining this case could conclude otherwise. Charles DeWeese, the Commissioner's expert, testified that amounts paid into the C-group policies exceeded conventional life insurance premiums by nearly 500%. See App. at 804-08, 2156.9  Evidence at trial

---

8. Of course, the mere fact that the benefit is a form of deductible compensation does not necessarily mean that it is taxable to the employee. See I.R.C. S 79. We note that the parties do not treat section 79 as significant here.

9. It should be noted that the Tax Court made certain credibility determinations, finding DeWeese, an independent consulting actuary, to be a "reliable, relevant, and helpful" witness whose testimony was bolstered by a voluminous record with stipulations to more than 2,000 facts and with more than 1,500 exhibits. See Neonatology, 115 T.C. at 86-87. By the same token, the court found that the opinions expressed by taxpayers' sole expert, Jay Jaffe, were of minimal help, considering his close relationship to one of the insurance companies that provided the C-group product at issue in the case. See id. (experts who act as advocates, "can be viewed only as hired guns of the side that retained

12

demonstrated that Dr. Mall knew that term life insurance was substantially more expensive to buy through the SC VEBA than through other plans offered to her under the auspices of the American Medical Association and the American Academy of Pediatrics. She nevertheless opted to form the Neonatology Plan because she believed that it offered her the best tax benefits. See App. at 1025. Dr. Hirshkowitz testified that Lakewood intentionally paid more expensive premiums on the C-group policies than it would have for conventional life insurance protection. See App. at 998. Dr. Desai, another Lakewood owner, testified that his independent personal life insurance cost him substantially less than the policies issued pursuant to the SC VEBA. See App. at 1047. Like Dr. Mall, the Lakewood owners nevertheless invested in the SC VEBA program because of Cohen's representation of tax benefits and cash returns that they could anticipate receiving. See App. at 1014-15.

The record also reveals that excess premium amounts did not pay for actual current year life insurance protection but rather paid for conversion credits. The compliance manager of the Providian Corporation, the parent of the Commonwealth Life Insurance Company which issued policies involved here, stated in a letter to the IRS that the "premiums paid for the term policy are higher than the traditional term policy because of the conversion privilege and the costs of conversion credits." App. at 3690. DeWeese, belying taxpayers' claim that C-group premiums were higher than those under ordinary term life policies because they were calibrated to the higher risks of longer

---

them, and this not only disparages their professional status but

precludes their assistance to the court in reaching a proper and reasonably accurate conclusion") (quoting Jacobson v. Comm'r, T.C. Memo. 1989-606, 58 T.C.M. (C.C.H.) 645)). The court also found that some of taxpayers' fact witnesses "testified incredibly with regard to material aspects of this case" and that their testimony, for the most part, was "self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence." Id. These types of credibility determinations are ensconced firmly within the province of a trial court, afforded broad deference on appeal. See Dardovitch v. Haltzman, 190 F.3d 125, 140 (3d Cir. 1999).

13

term employees in small markets,[10] testified that the bulk of the gross premiums went to accumulate assets for distribution to the individual participants upon conversion. See App. at 2173. In addition, the record supports the conclusion that payments made to the Lakewood Plan for annuities were made not to fund current life insurance protection for employees but rather were made as an investment for the trustee to pay premiums on future C-group premiums. See App. at 976, 993-94, 1041-42.

In sum, the evidence fully supports, indeed compels, the finding that the contributions in excess of the amounts necessary to pay for annual term life insurance protection were distributions of surplus cash and not ordinary and necessary business expenses. Considering the sound reasoning of the Tax Court and our own intensive review of the facts here, we conclude that it is implausible that the owners of Neonatology and Lakewood, educated and highly trained medical professionals, knowingly would have overpaid substantially for term life insurance unless they contemplated receiving an added boon such as a tax-free return of the excess contributions.

Taxpayers advance two arguments to the effect that the court erred by not limiting its consideration to the written plan documents and life insurance contracts rather than relying on extraneous evidence like the plan marketing materials which discuss the availability of conversion credits. First, they maintain that the Neonatology and Lakewood SC VEBA programs were employee benefit plans under the Employee Retirement Income Security Act, 29 U.S.C. S 1001 et seq., (ERISA). Thus, they contend that representations made outside of the plan documents cannot be used to consider rights and obligations arising out of the plans. See Br. of Appellants at 35. Second, they argue that under governing state insurance law, the tax implications of a group term life insurance policy are determined only on the basis of the policy language itself. As the literal provisions of the plans discuss only insurance benefits -- that is, a death benefit and an option to convert to an individual policy upon termination of employment --

---

10. See Br. of Appellants at 44 and n.30.

14

but say nothing about excess contributions returning as conversion credits, taxpayers claim that the Tax Court was compelled to conclude from the strict form of their plans that all contributions in fact went to providing insurance benefits.

Inasmuch as taxpayers did not raise the ERISA issue before the Tax Court, we need not consider it on this appeal. See Visco v. Comm'r, 281 F.3d 101, 104 (3d Cir. 2001). While we recognize that in some exceptional circumstances an appellate court may review a defaulted argument, in this case there are compelling reasons militating against our overlooking procedural norms to consider whether ERISA governed the SC VEBA programs as our determination may prejudice persons not parties to this case.11

In any event, even assuming for purposes of argument that the plans were employee benefit plans under ERISA, the fact remains that under well-established tax principles a court is not limited to plan documents in determining the tax consequences of a transaction. See, e.g., Comm'r v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708 (1945) ("The incidence of taxation depends upon the substance of a transaction."); ACM P'ship, 157 F.3d at 247 ("we must look beyond the form of the transaction to determine whether it has the economic substance that its form represents") (citations omitted); Lerman v. Comm'r, 939 F.2d 44, 54 (3d Cir. 1991) (Commissioner and courts have "the power and duty . . . to look beyond the mere forms of transactions to their economic substance and to

---

11. An amicus brief has been filed in this case on behalf of five physician-participants in the VEBA program who have filed a civil complaint against the insurance companies that wrote the C-group policies, Sankhla v. Commonwealth Life Ins. Co. et al., No. 01-CV-4761 (U.S.D.C. N.J.). Amici have an interest in the outcome of this case because the extent to which we address whether the plans are governed by ERISA could affect resolution of the issue of whether their state law claims against the insurance companies are preempted. See Amicus Br. at 1-2. Rather than needlessly prejudice the rights of litigants in separate proceedings, we do not discuss the applicability of ERISA to the VEBA plans.

15

apply the tax laws accordingly.").12 The cases cited by taxpayers,13 on the other hand, involve only disputes over

---

12. Taxpayers, conflating the so-called "substance-over-form" doctrine with the "economic substance" or "sham transaction" doctrine, mistakenly argue as well that a court may not disregard the form of an arrangement until it determines that the arrangement lacks any economic substance other than obtaining tax deductions. See Br. of Appellants at 41 ("If . . . there is any economic substance to the

arrangement apart from the alteration of tax liabilities, then the form of the arrangement must be respected, even if the arrangement was motivated by tax avoidance or minimization."). In actuality, the two doctrines are distinct. The substance-over-form doctrine is applicable to instances where the "substance" of a particular transaction produces tax results inconsistent with the "form" embodied in the underlying documentation, permitting a court to recharacterize the transaction in accordance with its substance. The economic substance doctrine, in contrast, applies where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large tax benefits that accrue (that is, a transaction "which actually occurred but which exploit[s] a feature of the tax code without any attendant economic risk," Horn v. Comm'r, 968 F.2d 1229, 1236 n.8 (D.C.Cir. 1992)); in that situation, where the transaction was an attempted tax shelter devoid of legitimate economic substance, the doctrine governs to deny those benefits. See generally Rogers v. United States, 281 F.3d 1108, 1113-18 (10th Cir. 2002). The Tax Court in this case, however, based its decision solely on the substance-over-form doctrine, finding that the form of the VEBA was not reflective of its genuine substance. In addition to the evidence we have set forth, the Tax Court's determination further is reinforced, inter alia, by the fact that taxpayers were allowed to convert the C-group term policies to individual C-group conversion UL policies even though none of the five required conditions for conversion were present, see Supp. App. at 106, 111-12, and by the fact that the amount of life insurance taken on the Lakewood principals did not correspond to the amount of benefits for which they were eligible under the plan documents. See, e.g., App. at 389, 400-03 (Dr. Hirshkowitz had C-group certificates on his life for over a million dollars even though he was eligible for life benefits of less than $500,000 -- 2.5 times his 1991 compensation of $181,199.09). Moreover, even under the economic substance doctrine taxpayers would be hard-pressed to argue that the transactions involving the excess term life insurance payments had sufficient economic substance to be respected for tax purposes.

13. See Br. of Appellants at 29-36 (citing Gruber v. Hubbard Bert Karle Weber, Inc., 159 F.3d 780 (3d Cir. 1998); Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491 (3d Cir. 1994); Schoonejongen v. Curtiss-Wright Corp., 18 F.3d 1034 (3d Cir. 1994); Henglein v. Informal Plan for Plant Shutdown Benefits, 974 F.2d 391 (3d Cir. 1992)).

16

ERISA benefits between private parties, not disputes over tax liabilities between private parties and the Commissioner. While the cases lay out certain principles for determining rights and obligations under an ERISA plan, including the standard contract theory that the literal terms of a plan document must guide all analysis, the cases say nothing about the proper evidentiary protocol for evaluating the tax ramifications of an employer benefit plan. In sum, we have no intention of importing ERISA principles into this tax dispute.

Moreover, we reject taxpayers' contention that the Tax Court erred by not limiting its evaluation to the plan documents in light of state insurance law. The court did not construe or interpret the terms of the individual taxpayers' life insurance policies, but rather characterized

the contributions made towards those policies for purposes of determining tax liabilities. While the former endeavor indeed would implicate state law,14 the latter is singularly a question of federal law. See, e.g., Thomas Flexible Coupling Co. v. Comm'r, 158 F.3d 828, 830 (3d Cir. 1946).

In view of our conclusion that the contributions in dispute were not ordinary and necessary business expenses under I.R.C. S 162(a), we next consider whether the district court erred in determining that the contributions constituted dividends rather than compensation to the individual taxpayers and thus deductible to the corporations on that basis.15 Under I.R.C. S 316(a), a dividend is a distribution of property made by a corporation to its shareholders out of its earnings and profits. See Comm'r v. Makransky, 321 F.2d 598, 601-03 (3d Cir. 1963).

_____

14. Curiously, taxpayers fail to specify which state's insurance law applies: New Jersey, where all of the physicians reside, or Pennsylvania, where the insurance agents who promoted the VEBA were located.

15. In their brief, taxpayers indicate that the Tax Court erred in characterizing the "disallowed contributions as constructive dividends rather than deductible compensation." Br. at 46 (emphasis added). See King's Ct. Mobile Home Park, Inc. v. Comm'r, 98 T.C. 511, 512 (1992) ("The first question is whether the diversion of $58,365 of petitioner's income by its controlling shareholder for personal use constitutes the payment of deductible wages or the distribution of a dividend.") (footnote omitted).

Dividends are taxed as a component of gross income. See I.R.C. S 61(a)(7). A shareholder, even if the corporation has dispensed with the formalities of declaration, may be charged with a disguised or constructive dividend if the corporation confers a direct benefit on him from available earnings and profits without expectation of repayment. See, e.g., Crosby v. United States, 496 F.2d 1388-89 (5th Cir. 1974); Noble v. Comm'r, 368 F.2d 439, 443 (9th Cir. 1966); see also Magnon v. Comm'r, 73 T.C. 980, 993-94 (1980) ("Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder, even though neither the corporation nor the shareholder intended a dividend.").

In this case, the record fully supports the conclusion of the Tax Court that the individual taxpayers were chargeable with constructive dividends. Indeed, Neonatology and Lakewood, by design surrendering any expectation of remuneration, purchased products that generated a considerable economic bounty for their shareholders in the form of conversion credits. Furthermore, nothing in the record illustrates that taxpayers diverted these corporate assets with the requisite "compensatory intent." See King's Ct. Mobile Home Park, Inc. v. Comm'r, 98 T.C. 511, 514-15 (1992) (business expense may be deducted as

compensation only if the payor intends at the time that the payment is made to compensate the recipient for services performed).16 Moreover, support for a conclusion, though certainly not dispositive, that the excess contributions were not paid as compensation for services rendered is supplied by the fact that the Neonatology and Lakewood plans were made available only to those individuals who owned the corporations and not to their non-equity employees. Furthermore, Dr. Mall directed Neonatology to purchase the C-group product on her husband, a non-employee third-party who did not perform any services for the corporation.17

---

16. To qualify as deductible compensation, a payment also need be reasonable. See Treas. Reg. S 1.162-7(a). We do not need to address this point, as the Tax Court correctly determined as a matter of fact that taxpayers did not demonstrate compensatory intent.

17. We are satisfied that the mere fact that Dr. Mall partially diverted the benefits to her husband should not change our result.

18

In the circumstances, it is therefore not surprising that Dr. Desai at trial made the matter-of-fact statement that the money contributed by Lakewood to fund insurance premiums and conversion credits is "our money. It's not Lakewood['s]." App. at 1055.

Taxpayers again rely on non-tax ERISA jurisprudence for the exaggerated proposition that payments made pursuant to an employee benefit plan are necessarily compensatory.18 However, the plain language of I.R.C. S 419(a)(2) explicitly contemplates situations where contributions paid or accrued by an employer to a welfare benefit fund are not deductible (deductions allowed only if "they would otherwise be deductible"); see also Treas. Reg. S 1.162-10(a) (contributions to employee benefit plans deductible only if "they are ordinary and necessary business expenses."). To read otherwise inexplicably creates a shelter loophole by allowing taxpayers to transform disbursements into deductible business expenses merely by funneling them through an ERISA plan.

We recognize that it is axiomatic that taxpayers lawfully may arrange their affairs to keep taxes as low as possible.19 Nevertheless, at the same time the law imposes certain threshold duties which a taxpayer may not shirk simply by manipulating figures or maneuvering assets to conceal their real character. See Court Holding Co., 324 U.S. at 334, 65 S.Ct. at 708 ("[t]o permit the true nature of a transaction to be disguised by mere formalisms . . . would seriously impair the effective administration of the tax policies of Congress."); see also Saviano v. Comm'r, 765 F.2d 643, 654 (7th Cir. 1985) ("The freedom to arrange one's affairs to minimize taxes does not include the right to engage in

---

18. Taxpayers misread Pediatric Surgical Assoc., P.C. v. Comm'r, 81

T.C.M. (CCH) 1474, 1479 (2001), for the proposition that anything paid by a corporation for an employee's benefit is presumed legally to be compensation. Rather, Pediatric Surgical clearly iterates that intent to pay compensation "is a factual question to be decided on the basis of the particular facts and circumstances of the case." Id. at 1480.

19. See Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.").

financial fantasies with the expectation that the Internal Revenue Service will play along."). Thus, we conclude that the Tax Court correctly held that the inflated premiums were not allowable corporate business expenses but rather allocations in the nature of dividends and thusly taxable.

B. The Penalties

Finally, we must consider the aptness of the penalties assessed by the Commissioner and upheld by the Tax Court. The Internal Revenue Code imposes a 20% tax on the portion of an underpayment attributable, among other things, to negligence or the disregard of rules and regulations. I.R.C. SS 6662(a) and (b)(1)."Negligence" can include any failure to make a reasonable attempt to comply with the provisions of the Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. I.R.C. S 6662(c); Treas. Reg. S 1.6662-3(b)(1). Generally speaking, the negligence standard as in the tort context is objective, requiring a finding of a lack of due care or a failure to do what a reasonable and prudent person would do under analogous circumstances. See, e.g., Schrum v. Comm'r, 33 F.3d 426, 437 (4th Cir. 1994).

On the basis of the record, the Tax Court was justified in concluding as a matter of fact that the individual taxpayers were liable for the section 6662 accuracy-related penalties because they did not meet their burden of proving due care. See Hayden v. Comm'r, 204 F.3d 772, 775 (7th Cir. 2000) (the Commissioner's determination of negligence is presumed to be correct, and the taxpayer has the burden of proving that the penalties are erroneous); accord Pahl v. Comm'r, 150 F.3d 1124, 1131 (9th Cir. 1998) (burden of disproving negligence on taxpayer); Goldman v. Comm'r, 39 F.3d 402, 407 (2d Cir. 1994) (once the Commissioner determines that a negligence penalty is appropriate, the taxpayer bears the burden of establishing the absence of negligence). The physician-owners caused their corporations to overpay considerably for term life insurance knowing that the money could be rerouted circuitously to their personal coffers with a net tax savings. Yet, notwithstanding the extraordinary financial implications of the SC VEBA arrangement, the individual taxpayers did not

make a proper investigation or exercise due diligence to verify the program's tax legitimacy. See David v. Comm'r, 43 F.3d 788, 789-90 (2d Cir. 1995); see also Pasternak v. Comm'r, 990 F.2d 893, 903 (6th Cir. 1993) (holding that a reasonably prudent person should investigate claims when they are likely "too good to be true") (quoting McCrary v. Comm'r, 92 T.C. 827, 850 (1989)).

Taxpayers argue that their negligence should have been excused because they relied on the advice of professionals. While it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence, see, e.g., United States v. Boyle, 469 U.S. 241, 250, 105 S.Ct. 687, 692 (1985), the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about. See Treas. Reg.S 1.6664-4(c); Ellwest Stereo Theatres, Inc. v. Comm'r, T.C. Memo. 1995-610, 70 T.C.M. (C.C.H.) 1655; see also Zfass v. Comm'r, 118 F.3d 184, 189 (4th Cir. 1997).

The Tax Court concluded that taxpayers could not prevail on a reliance-on-professional defense because they received advice only from Cohen, an insurance agent who stood to profit considerably from the participation of Neonatology and Lakewood in the VEBA program, rather than from a competent, independent tax professional with sufficient expertise to warrant reliance. The circumstances here, including the facts that certified public accountants prepared taxpayers' returns, the New Jersey Medical Society -- a group with dubious tax code proficiency which in fact received royalties to endorse the SC VEBA 20 -- purportedly endorsed the program, and the engagement agreement between PES and the employers stated that PES would submit the trust to the IRS for qualification, 21 do not

_____

20. See App. at 570-71.

21. Notably, the agreement does not say that the IRS did qualify the plan. In fact, as the government points out, the IRS expressly disavowed any opinion as to whether contributions to the plan were deductible. See App. at 1410.

suffice for us to disturb the Tax Court's negligence finding on a clear error basis. See Merino v. Comm'r, 196 F.3d 147, 154 (3d Cir. 1999).

In reaching our result, we acknowledge that Dr. Hirshkowitz deviated from the thoroughly head-in-the-sand posture of his fellow taxpayers by soliciting his accountant's opinion of the SC VEBA. See App. at 6666-67.

Nevertheless, the record supports the court's finding with respect to Dr. Hirshkowitz, considering that he did not introduce into evidence precisely what information he showed to his accountant, precisely what advice his accountant gave him, and, more generally, the qualifications of his accountant.

We also add the following. When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril. In this case, PES devised a program which it marketed as "creat[ing] a tax deduction for the contributions to the employee welfare benefit plan going in and a permanent tax deferral coming out." As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves.22

In a final attempt to skirt the additional penalties, taxpayers argue that a finding of negligence could not in fairness arise out of a case resolving tax issues of first impression. In this regard, we point out that the parties have indicated that this case is indeed without direct precedent and that other cases are awaiting our disposition.23

---

22. It well may be that reliance on the advice of a professional should only be a defense when the professional's fees are not dependent on his opinion. For example, it is not immediately evident why a taxpayer should be able to take comfort in the advice of a professional promoting a tax shelter for a fee. After all, that professional would have an interest in his opinion. Consideration of this point, however, will have to wait for another day.

23. The Tax Court observed that this case is a test case with the result resolving other cases involving SC VEBA and NJ VEBA plans and that the parties in 19 other cases pending before the Tax Court have agreed to be bound by the decision here. See Neonatology, 115 T.C. at 44.

This argument, however, does not sway us for this case does not involve novel questions of law but rather is concerned with the application of well-settled principles of taxation to determine whether certain expenditures made by close corporations are deductible as ordinary and necessary business expenses or taxable as constructive dividends. While the setting in which these principles have come to bear is no doubt unusual with its VEBAs, C-group policies, and conversion credits, the law was nevertheless pellucid that taxpayers should have endeavored to verify the validity of their deductions before claiming them.24 Moreover, they should have been apprehensive when they examined the scheme, for experience shows that when something seems too good to be true that probably is the case. Overall, we are satisfied that taxpayers now must abide the consequences of the Commissioner's audit as sustained by the Tax Court, including the finding of liability

for accuracy-related penalties under section 6662.

IV. CONCLUSION

For the foregoing reasons, we will affirm the decisions of the Tax Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

24. We recognize that courts have overlooked negligence penalties in cases of first impression that involve unclear statutory language. See, e.g., Mitchell v. Comm'r, T.C. Memo. 2000-145, 79 T.C.M. (C.C.H.) 1954 (recognizing exception in a case of first impression involving the unclear application of an amendment to the Internal Revenue Code); Hitchins v. Comm'r, 103 T.C. 711, 720 (1994) (first impression exception applies to issue not previously considered by the court where the statutory language is not entirely clear). But nothing in this case hinges on the interpretation of vague statutory text.

23